Argued and submitted January 28; resubmitted in banc
September 2, reversed and remanded September 8,
reconsideration denied December 4,
petition for review denied December 22, 1981 (292 Or 334)

GEORGE MARTIN ROLFE,
*Petitioner,*

*v.*

PSYCHIATRIC SECURITY REVIEW
BOARD,
*Respondent.*

(PSRB No. 80-121, CA 18328)

633 P2d 846

Susan Longbrook, Portland, argued the cause for appellant. With her on the brief was King & Longbrook, Portland.

Lisa Brown, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were James M. Brown, Attorney General, John R. McCulloch, Jr., Solicitor General, and William F. Gary, Deputy Solicitor General, Salem.

YOUNG, J.

Joseph, J., dissenting opinion.

### YOUNG, J.

Petitioner appeals from an order of the Psychiatric Security Review Board (PSRB) conditionally releasing him from his confinement to the Oregon State Hospital (OSH). Petitioner argues he should have been discharged from PSRB's jurisdiction. We review under ORS 183.482 and remand for further hearing.

On April 4, 1979, petitioner broke into the house of his estranged wife and engaged in a course of conduct resulting in criminal charges of first degree rape, sodomy, robbery and burglary. On October 19, 1979, the court found that petitioner would have been convicted of those crimes, but concluded he was not responsible because he had been affected by a mental disease or defect. The court, finding that petitioner continued to be so affected and presented a substantial danger to himself or others, placed him under the jurisdiction of PSRB for a period not to exceed 60 years. A hearing was held by PSRB in June, 1980, as required by ORS 161.341(6).[1] Petitioner appeals from the order issued.

ORS 161.341(6) requires PSRB to exercise its continuing supervisory function and redetermine whether the individual is dangerous and still affected by a mental disease or defect. *See Adams v. Psychiatric Review Bd.,* 290 Or 273, 279 n. 10, 281 n. 12, 621 P2d 572 (1980). "The state has the burden of proving by a preponderance of the evidence that the person continues to be affected by mental disease or defect and * * * continues to be a substantial danger to himself or others." ORS 161.351(2). Unless both elements exist, the person must be discharged. ORS 161.346(1)(a); *cf.* ORS 161.351(1).[2] A person whose mental

---

[1] ORS 161.341(6) provides in part:

"In no case shall any person committed by the court under ORS 161.327 to a state hospital designated by the Mental Health Division be held in the hospital for more than six months from the date of the court's commitment order without an initial hearing before the board to determine whether the person should be conditionally released or discharged. * * *"

[2] ORS 161.346(1)(a) states:

"(1) the board shall conduct hearings upon any application for discharge, conditional release, commitment or modification filed pursuant to ORS 161.336, 161.341 or 161.351 *and as otherwise required by ORS 161.336 to 161.351 and 161.385 to 161.395* and shall make findings on the issues before it which may include:

disease is in a state of remission, however, is considered still to be affected by the disease or defect. ORS 161.351(2). That person cannot be discharged if his disease "may, with reasonable medical probability, occasionally become active and * * * render him a danger to himself or others * * *." ORS 161.351(2). Under those circumstances he would be considered still to be a substantial danger to himself or others. *Cochenour v. PSRB,* 47 Or App 1097, 1102, 615 P2d 1155 (1980).

PSRB originally issued an order continuing petitioner's commitment, but then reconsidered and ordered him conditionally released. Its modified order and opinion contain findings of ultimate fact adequate to justify its continued jurisdiction over petitioner. In particular, PSRB found that petitioner — though not at that time a present danger — could not be discharged because his mental disease or defect was in a state of remission and might, with reasonable medical probability, become active, which then would render him a danger to himself or others. Petitioner's sole contention is that this finding is not supported by substantial evidence.

In making the above finding, PSRB relied not only on the evidence in the record of the hearing but also on "the

---

"(a) If the board finds that the person is no longer affected by mental disease or defect, or, if so affected, that he no longer presents a substantial danger to himself or others, the board shall order him discharged from commitment or from conditional release." (Emphasis supplied.)

ORS 161.351(1) states:

"Any person placed under the jurisdiction of the Psychiatric Security Review Board pursuant to ORS 161.336 or 161.341, shall be discharged at such time as the board shall find by a preponderance of the evidence that the person is no longer affected by mental disease or defect or, if he continues to be so affected, that he no longer presents a substantial danger to himself or others *which requires regular medical care, medication, supervision or treatment."* (Emphasis supplied.)

The italicized language in ORS 161.351(1) does not appear in ORS 161.346(1)(a). The italicized language in ORS 161.346(1) was added by 1979 Oregon Laws, ch 885, § 5, and makes that statute applicable to all hearings held under ORS 161.341. We are, consequently, uncertain what purpose is now served by ORS 161.351(1). Moreover, the clause in ORS 161.351(1) "which requires regular medical care, medication, supervision or treatment" is confusing, since grammatically it refers to the "danger," and yet substantively it seems to refer to the disease.

observations and opinions of the expert members" of the board; the latter were attached as exhibits to the board's modified order and opinion.

The evidence presented shows that petitioner has attempted suicide between 20 and 30 times since 1968. He was admitted to OSH for the first time in 1973, when he voluntarily committed himself because of severe depression and an attempted suicide. He was diagnosed as suffering from depressive neurosis. He responded quickly to treatment and was released after one week.

Petitioner committed himself to OSH a second time in May, 1979.[3] His case summary reports his suicide attempts and indicates that there had not been a six month period since 1968 when he had been free of suicidal ideation. It also relates that petitioner described periods of uncontrollable rage, with no apparent provocation, which resulted in outbursts of violence (though no injury occurred.) Petitioner was diagnosed at admission as again suffering from depressive neurosis. At the time of his release in July, 1979, the diagnosis was revised to "hysterical personality disorder," with a prognosis "somewhat poor, considering the chronicity of his behavior * * * and his youthfulness."

On July 6, 1979, petitioner was examined by a private psychiatrist, Candace McCanna, M. D., whose report was also made part of the record here. Dr. McCanna's report details petitioner's history and concludes:

> "In summary, this is a young man with long-term history of difficulty in adjusting. He demonstrates episodic destructive behavior for which he has no conscious recollection. This behavior appears to manifest itself when Mr. Rolfe is in a stressful situation, particularly relating to fear of loss of love as when he feels threat of rejection by school mates, teachers, or marital partners. He appears to be poorly integrated in his experiencing of good and evil within himself and others.
>
> "It is my conclusion that on April 4, 1979, during the time of the alleged criminal activity, Mr. Rolfe did suffer from a mental disease which would cause him to lack

---

[3] The record does not show what petitioner was doing or what his status was between April 4, 1979, the date of the assault against his wife, and May, 1979.

substantial capacity to conform his conduct to the requirements of the law and to appreciate the criminality of his conduct. I believe that there is sufficient evidence to support the diagnosis of Borderline Personality Disorder manifested in Mr. Rolfe by episodic emergence of profound psychotic behavior patterns precipitated by stressful situations and followed by relatively prompt restitution of a functioning personality.

"Prognosis is poor due to Mr. Rolfe's immature, irresponsible attitude and lack of commitment to treatment."

All of the above relates to petitioner's psychiatric condition at times prior to his court ordered commitment. It is the evidence upon which the court ordered commitment on October 19, 1979, and it is the evidence relied on by PSRB when it decided in October, 1980, to retain jurisdiction over petitioner. It does not, however, constitute the entire administrative record. The record also contains several letters and reports by members of the professional staff at OSH, all written within one month prior to petitioner's hearing. These exhibits consistently state: (1) petitioner was not at that time (May, 1980) a danger to himself or others; (2) he had reacted extremely well to his treatment at OSH; and (3) he did not require further hospitalization. Two of these reports address the likelihood of petitioner's future dangerousness; both state that it is not likely that he will present a danger to himself or others. None of the exhibits, however, states that petitioner is "cured";[4] rather, all inferentially indicate that out-patient treatment would be appropriate. In this respect, the exhibits — except for the statements regarding petitioner's future dangerousness — are *consistent* with the *result* reached by PSRB — release and continuation of treatment.

■■ Under the statutory scheme, the validity of the program worked out by PSRB requires more than mere consistency with what experts feel would be appropriate treatment. In order for PSRB to retain jurisdiction over

---

[4] One of the exhibits written in May, 1980, is a psychological report submitted by Dr. John B. Cochran, a clinical psychologist at OSH. Dr. Cochran states his diagnostic impression of petitioner as, "Passive — aggressive personality with passive — dependent features." The record does not indicate whether this diagnosis constitutes a mental disease or defect, but PSRB found that petitioner still suffers from a disease or defect, and petitioner does not challenge that finding here.

petitioner, there must be legally sufficient evidence presented to the board at the hearing to support a finding that petitioner is dangerous. PSRB made no finding that he presented a danger to himself or others at the time of the hearing. The only other way to satisfy the requirement of dangerousness, therefore, is to find that his disease "may, with reasonable *medical probability,* occasionally become active and when it does will render him a danger to himself or others * * *." ORS 161.351(2). (Emphasis supplied.) That is precisely the justification PSRB found for retaining jurisdiction.

■ ■    Petitioner first challenges that finding by arguing that the board gave undue weight to his criminal and psychiatric history, as opposed to the evaluations written in May, 1980, by the professional staff at OSH.

> " 'The determination as to whether a person is dangerous * * * must focus on his or her condition at the time of the hearing. The actions and statements of a person alleged to be mentally ill which occur prior to the hearing are, of course, probative as to the person's present mental condition. But a mere recitation of past acts, in the absence of a showing that such clearly forms the foundation for a prediction of future dangerousness, cannot serve as the basis for a finding that one is a mentally ill person * * *.' " (Citations omitted.) *Adams v. Psychiatric Review Bd.,* 45 Or App 997, 1003 n. 9, 609 P2d 908, *reversed on other grounds,* 290 Or 273 (1980), quoting *State v. Lucas,* 31 Or App 947, 950, 571 P2d 1275 (1977).

PSRB properly considered petitioner's psychiatric and criminal history. *See* ORS 161.346(3).[5] At these hearings, the individual's history is probative; the only question

---

[5] ORS 161.346(3) provides:

"(3) The board may make the determination regarding discharge or conditional release based upon the written reports submitted pursuant to this section. If any member of the board desires further information from the examining psychiatrist or licensed psychologist, who submitted the report, these persons shall be summoned by the board to give testimony. The board shall consider all evidence available to it which is material, relevant and reliable regarding the issues before the board. Such evidence may include but is not limited to the record of trial, the information supplied by the district attorney or the court or department of the county from which the person was committed or by any other interested party, including the person, and information concerning the person's mental condition and the entire psychiatric and criminal history of the person. All evidence of a type commonly relied upon by reasonably prudent persons in the conduct of their serious affairs shall be admissible at hearings."

is the extent of its probative value, which will depend on the circumstances of each case. Unlike the individuals in *Lucas* and *Adams,* petitioner has a lengthy and continuous history of psychiatric disorder and violent behavior toward himself and others. PSRB could reasonably consider his history to be probative evidence as a "foundation for a prediction of future dangerousness." Nonetheless, we hold that the board's decision in this case suffers from a fatal evidentiary defect: the only evidence in the record showing that the necessary prediction was ever made was inserted into the record by the Board in an impermissible way.

■ Absent a finding of present dangerousness, PSRB must discharge individuals from its jurisdiction unless it finds the person's mental disease or defect may, with reasonable *medical* probability, occasionally become active, rendering him dangerous. ORS 161.351(2). Reliance on this aspect of the statutory framework to retain jurisdiction requires a conclusion founded on medical expertise. Whether in individual cases there is a medical probability of reactivation is for PSRB to decide. That decision, nonetheless, must be made on the basis of evidence in the record. ORS 183.450(5). The only way in which the record in this case could support a finding of a *medical* probability is by introduction of expert testimony expressing an opinion that such a probability exists, and the only evidence of that kind in this record was improperly received. We turn to the evidentiary defect.

■ PSRB is an agency which possesses the collective expertise of its members — a psychiatrist, a psychologist, a lawyer, a person with substantial experience in processes of parole and probation and a layperson. *See* ORS 161.385(2). It also develops its own expertise by virtue of its administrative function. In the present case, the board, in rendering its decision, relied on the opinions and observations of two of its expert members, in addition to the evidence presented at the hearing. The memoranda submitted by the two members were attached as exhibits to the board's opinion. An examination of three excerpts from these memoranda will serve to demonstrate the sometimes fine line between the evaluation of evidence on the one hand and the insertion into the record of new evidence on the

other. The first act is a necessary part of the board's duties; the second is impermissible.

(1) Alice Shannon, M. D., the psychiatrist member, concluded that petitioner continued to be affected by a personality disorder and was still dangerous if not supervised. In reaching this conclusion, she discounted the opposing evidence presented in the letters from the staff members at OSH. Dr. Shannon noted:

"These individuals are people who knew and/or evaluated him in the hospital, a structured, controlled atmosphere. It is an environment where stress is within limits and controllable through the support of staff and structure. There is lacking the day to day responsibilities and stresses of life. Regardless of one's evaluation of OSH, it is to a greater or lesser extent a therapeutic community. It is a setting in which improvement can be expected."

These statements merely reflect an evaluative process on the part of Dr. Shannon. They are not susceptible to objection as a recitation of extra-record facts since each statement is at least inferentially supported by evidence that the OSH staff members evaluated petitioner at a hospital.

■ (2) Dr. Shannon also felt that, because petitioner suffered from a personality disorder, he was in need of further treatment under PSRB's supervision:

*"Psychiatrically, personality disorders are disorders which require long-term, consistent treatment."* (Emphasis supplied.)

This statement of fact finds absolutely no other support in the record. No evidence was introduced to indicate whether a personality disorder necessarily requires long-term treatment or whether it can be sufficiently cared for with short-term treatment. It *might be* argued that the treatment of personality disorders is capable of being officially noticed. ORS 183.450(4) provides:

"Agencies may take notice of judicially cognizable facts, and they may take official notice of general, technical or scientific facts within their specialized knowledge. Parties shall be notified at any time during the proceeding but in any event prior to the final decision of material officially noticed and they shall be afforded an opportunity to contest the facts so noticed. Agencies may utilize their

experience, technical competence and specialized knowledge in the evaluation of the evidence presented to them."

We are uncertain whether the proper treatment of personality disorders is so well known within the psychiatric community as to permit official notice of it under ORS 183.450(4), but in any event PSRB failed to provide the notification and opportunity to rebut which the statute requires. Since the fact recited does not appear in the hearing record and was not formally noticed, it was not proper for the board to consider it.

■        (3)   Rick McKenna, an experienced probation officer, expressed his belief that petitioner, in all probability, would react violently under stress and become dangerous, stating:

> "I would observe, *based upon my ten-year experience as a parole officer,* that individuals with the kind of profile Rolfe is exhibiting require close supervision. Their behavior tends to be governed by internal feelings/directions which they find difficult to communicate to others and while they usually exhibit a fairly superficial control over themselves, this level of control is not significant. Their tendency is, when under stress, to revert to old behavior patterns. Hence they can be highly unpredictable in the sense of appearing very 'normal' even when the level of internal feeling/direction has reached dangerous levels. I would suggest that a careful review of Rolfe's file clearly demonstrates that this has been the case with him in the past and will, in all probability, continue to be the case in the future. I feel that continuation of Rolfe under supervision, particularly since he is now back in the community, is essential." (Emphasis supplied.)

This statement demonstrates most clearly how the board has impermissibly supplemented the record with facts outside of the hearing. Here, Mr. McKenna in essence is testifying regarding his own experience with persons having backgrounds similar to petitioner's. He states they require close supervision; they are governed by internal feelings; they revert to old behavior patterns; they are highly unpredictable. These characterizations, which Mr. McKenna presents as fact, are crucial to his expert opinion that *petitioner* will revert to his past behavior. The vice of receiving these "facts" as evidence outside of the hearing is

that it deprives petitioner an opportunity to challenge them. Without presentation at a hearing, petitioner has no way of showing that these facts — which carry much weight — either are not well founded or are not relevant to his case for some distinguishing reason.

■     As previously noted, ORS 183.450(4) directs that "[a]gencies may utilize their experience, technical competence and specialized knowledge in the evaluation of the evidence presented to them." It is one thing, however, to say that an agency may employ its experience and expertise to evaluate and understand evidence and quite another to allow it to use its special knowledge as a substitute for evidence presented at a hearing. A fundamental premise of administrative law is that the quality and efficiency of the regulatory process will be enhanced by delegating authority to experienced, expert administrators. Just as fundamental, however, is the principle that factfinding in contested cases is governed exclusively by the record of the hearing.

> "* * * [E]xclusiveness of the record is at the core of the right to a fair hearing. Without that principle the hearing itself can be but a sham. * * * Only if the agency is limited to the record of the hearing can the private party have assurance that he not only has a full opportunity to present his case but, more important, opportunity to confront and rebut the entire case against him. Without the exclusiveness principle the right to be heard is a right only to present one side of the case. The hearing itself becomes only an administrative town meeting rather than the adversary proceeding required by due process." B. Schwartz, *Administrative Law* 358 (1976).

In this case, PSRB has not merely evaluated evidence but has supplied evidence derived from personal knowledge to support its decision. This procedure ignores the requirement that only officially noticed facts and evidence offered and made part of the record may be considered in the determination of the case. ORS 183.450(2),(4).

The board's order in this case is structured in such a way as to lead us to offer some guidance regarding the role of its expertise in individual decision making. We hope this opinion has provided that guidance. PSRB's error in this case derives from both a misunderstanding of the

statutory requirements for decision making and a misapprehension of the role of its expertise. For this error in procedure, we remand to the agency for further hearing. ORS 183.482(7).

Reversed and remanded.

**JOSEPH, C. J.,** dissenting.

Because I think the majority's result is contrary to the overall legislative scheme and threatens the vitality and utility of PSRB, I dissent.

In general I accept everything up through the full paragraph at 53 Or App at 948. Thereafter, the opinion treats as "evidence" or as "fact" some matters that, in all fairness, were only expressions of professional expert opinion furnished by persons whose presence on the Board is provided for by statute (ORS 161.385) so that the system can have the advantage of their professional judgments.

The opinion (53 Or App at 949) accepts certain statements of Dr. Shannon, the psychiatrist member of the Board, as "merely" reflecting "an evaluative process." That is proper. The opinion immediately proceeds to treat as a "statement of fact" a clearly identified and properly stated expression of professional medical opinion, which we must assume was based on her expertise. *See* ORS 41.360(15). The majority's citation of ORS 183.450(4) is appropriate, but only for the last sentence — which applies to what Dr. Shannon did in this case. She did *not* violate the statutory rule of "notice of judicially cognizable facts" or taking "official notice of general, technical or scientific facts." She explained how she, as a professional, as a physician and as a psychiatrist, arrived at her conclusion. I think the same view ought to be taken of Mr. McKenna's statement as an expert member.

The majority's opinion states, at 53 Or App at 951: "In this case, PSRB has not merely evaluated evidence but has supplied evidence derived from personal knowledge to support its decision." In my view that is simply not true. The only "vice" in the order under review is that, by having

attached to it transcriptions of the two members' statements, the order made explicit the doing of that which is implicitly required by the nature of the composition of the Board.

The danger of the majority's view is that it will effectively destroy the utility of the expert, professional members of the Board — or, at best, it may force them into undesirable subterfuges. To make my point as sharp as possible: Were I either Dr. Shannon or Mr. McKenna, I would resign from the Board in the face of this opinion, because it will severely and unreasonably limit me in doing what I was appointed to do..

Thornton, Buttler and Van Hoomissen, JJ, join in this dissent.