Argued and submitted March 27, 2019, order set aside June 17, petition for review denied September 17, 2020 (367 Or 75)

OREGON AFSCME COUNCIL 75,
*Respondent,*

*v.*

STATE OF OREGON,
OREGON JUDICIAL DEPARTMENT -
YAMHILL COUNTY,
*Petitioner.*

Employment Relations Board
RC00317; A167661

469 P3d 812

Petitioner, the Oregon Judicial Department (OJD), petitioned for review of an order of the Employment Relations Board (ERB) that certified Oregon AFSCME Council 75 as the exclusive representative of a bargaining unit consisting of 27 nonsupervisory employees working in the Yamhill County Circuit Court (27 employees). ERB concluded that the 27 employees were sufficiently separate and apart from the rest of OJD's employees to be an appropriate bargaining unit for representation. On review of that order, OJD argues that ERB erred as a matter of law in ordering certification of a single-court bargaining unit and, alternatively, that ERB's order was not supported by substantial evidence or substantial reason. *Held*: Although ERB did not err as a matter of law in ordering certification of a single-court bargaining unit, ERB's order was not supported by substantial evidence or substantial reason.

Order set aside.

Leigh A. Salmon, Assistant Attorney General, argued the cause for petitioner. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Jason M. Weyand argued the cause for respondent. Also on the brief was Tedesco Law Group.

Before Ortega, Presiding Judge, and Powers, Judge, and Linder, Senior Judge.

LINDER, S. J.

Order set aside.

**LINDER, S. J.**

Under the Public Employees Collective Bargaining Act (PECBA), ORS 243.650 to 253.782, public employees have the right to "form, join and participate in the activities of labor organizations of their own choosing for the purpose of representation and collective bargaining with their public employer on matters concerning employment relations." ORS 243.662. A public employer, however, is not required to bargain with any labor organization that a group of its employees selects to represent them. Rather, the employer's obligation to bargain with a chosen labor organization arises only if the organization is "certified by the Employment Relations Board or recognized by the public employer," in which case it is the "exclusive" bargaining representative for the group of employees. ORS 243.666(1).

In this case, Oregon AFSCME Council 75 (AFSCME) petitioned the Employment Relations Board (ERB) to certify it as the exclusive representative of a bargaining unit consisting of 27 nonsupervisory employees working in the Yamhill County Circuit Court. With one member dissenting, ERB ordered the certification, concluding that those employees were an "appropriate" bargaining unit for representation separate and apart from the remaining 1,200 or so unrepresented employees of the Oregon Judicial Department (OJD).[1] OJD petitions for review of ERB's order, contending that ERB erred in its appropriate unit determination. For the reasons explained below, we agree and set aside ERB's order.

## I.  BACKGROUND

After AFSCME filed its petition seeking certification of the proposed bargaining unit, a hearing was held by an administrative law judge, who issued a proposed order that drew objections from both parties. After oral argument on the parties' cross-objections, ERB issued its final order, which included extensive factual findings. Some of ERB's findings were based on the evidentiary record developed at

---

[1] Although this case involves OJD as a party and raises issues that pertain to the statewide court system, neither party has questioned the propriety of this court hearing and resolving AFSCME's petition for review.

the hearing and others were based on statutory provisions and OJD rules.

On review, neither party challenges ERB's findings of fact. We therefore base our description of the historical facts on ERB's evidence-based findings, supplemented with facts in the record consistent with ERB's findings. *Meltebeke v. Bureau of Labor and Industries*, 322 Or 132, 134, 903 P2d 351 (1995), *abrogated on other grounds by State v. Hickman*, 358 Or 1, 24, 358 P3d 987 (2015) (unchallenged agency findings of fact are binding on judicial review); *Wallace v. State ex rel PERS*, 249 Or App 214, 215, 275 P3d 997, *rev den*, 352 Or 342 (2012) (on review, court draws from unchallenged agency factual findings, supplemented by the record). The pertinent statutory scheme and rules, and any relevant legislative history, are appropriate for this court to review and consider independent of ERB's "factual findings" describing that scheme.[2] *Cf. Dept. of Human Services v. J. R. F.*, 351 Or 570, 579, 273 P3d 87 (2012) (court has independent obligation to interpret statutes correctly, which includes considering relevant context).

A.    *The Unification of Oregon's Court System*

From statehood and into the early 1980s, Oregon's state trial court system (circuit and district courts) was largely funded and administered at the county level; only the Supreme Court, initially, and later the Court of Appeals and Tax Court, were fully state-funded and centrally administered. Although trial court judges were state officials and paid by the state, all other trial court staff were county employees. Their salaries, benefits, work responsibilities, and other terms of their employment were the responsibility of the respective counties in which the state's trial courts were located. 1980 Report of the Oregon Commission on the Judicial Branch at 5-6, 26 (February 1981) (1980 Report).[3]

---

[2] We do not suggest any error or inaccuracy in ERB's statutory and rule-based "findings." But our own review and discussion touches on aspects of the statutes and their legislative history not mentioned by ERB.

[3] Although we cite the 1980 Report for some of the legislative historical context, aspects of the same history were recounted at the hearing by then-Chief Justice Balmer and then-State Court Administrator Kingsley Click.

That system of locally funded and operated trial courts changed with the enactment of what at the time was commonly termed the "Court Reform Act."[4] Beginning in 1983, the legislature consolidated Oregon's trial courts, Tax Court, and appellate courts into a single unified court system funded directly by the state and administered centrally on a statewide basis.[5] Trial court employees ceased to be employees of the individual counties in which they worked and instead became employees of the state. ORS 8.235. Each county's responsibility was primarily limited to maintaining its respective physical courthouse facility, which remained county property. ORS 1.185(1).

A host of concerns prompted that legislative change. Among them was that trial court funding by "36 counties in 36 budgets," even as supplemented by some state funding, led to "levels of support [that were] uneven and often unpredictable." 1980 Report at 5. Also, the trial judges who exercised administrative responsibility at the local level were often selected by their peers for reasons other than their "administrative talents." *Id*. Regardless of their administrative abilities, those judges had "little control over the county personnel upon whom they [had to] rely to perform judicial duties." *Id*. And although the Chief Justice had some general administrative and supervisory authority over the court system as a whole, in practice that authority was ineffective. *Id*. As a result, there was "little administrative cohesion and less administrative accountability in the judicial branch" than in the other branches of government. *Id*. The legislature distilled those and other concerns that led to the unification of Oregon's court system into a statutory declaration of purpose:

---

[4] Or Laws 1981, ch 1 and ch 3 (Spec Sess); *see Circuit Court v. AFSCME*, 295 Or 542, 546 n 2, 669 P2d 314 (1983) (referring to legislation as "Court Reform Act"); *Lent v. ERB*, 63 Or App 400, 402 n 1, 664 P2d 1110, *rev den*, 295 Or 617 (1983) (same).

[5] An additional aspect of the proposed court reform was to consolidate the district and circuit courts into a single circuit court system. Distinguished members of the bench and bar had argued for that consolidation since at least the early 1970s. *See generally* 1980 Report at 63-64; Kenneth J. O'Connell, *We Should Unify the Trial Courts in Oregon*, 51 Or L Rev 641 (1972). The legislature did not undertake the district court-circuit court consolidation as part of the massive changes it implemented in 1983 with the Court Reform Act; that further reform instead came later. Or Laws 1995, ch 658 (effective Jan 1, 1998).

"The Legislative Assembly hereby declares that, as a matter of statewide concern, it is in the best interests of the people of this state that the judicial branch of state government, including the appellate, tax and circuit courts, be funded and operated at the state level. The Legislative Assembly finds that state funding and operation of the judicial branch can provide for best statewide allocation of governmental resources according to the actual needs of the people and of the judicial branch by establishing an accountable, equitably funded and uniformly administered system of justice for all the people of this state."

ORS 1.001.

## B.   *Administrative Structure of the Unified Court System*

Central to achieving an accountable, equitably funded, and uniformly administered justice system was "the establishment of clear and direct lines of administrative authority and accountability within the judicial branch, with a strong executive office of Chief Justice." 1980 Report at 5. To that end, the legislature designated the Chief Justice of the Oregon Supreme Court as the "head of the judicial department" with "administrative authority and supervision over the courts of this state[.]" ORS 1.002. The administrative powers and responsibilities that the legislature conferred on the Chief Justice are wide-ranging and extensive. For OJD generally, as well as for the individual state courts, the Chief Justice is charged with, among other responsibilities: determining all policies and procedures for budget and fiscal management; setting staffing levels; assigning or reassigning all court staff; devising all personnel rules and policies, including compensation and benefits; overseeing the acquisition, use and disposition of all property used by the courts; providing for court security, emergency preparedness, and the continuation of court services in emergencies; designing and implementing technological and other business processes for court operations; and overseeing all court services to the public, including prescribing uniform rules of procedures for civil and criminal proceedings. *See* ORS 1.002 (enumerating general powers of Chief Justice); ORS 1.006 (authority over uniform rules of court procedure); ORS 1.008 (responsibility over personnel, budget, and property management); ORS 1.177 (responsibility

for court security, emergency preparedness, and business continuity planning).

The Chief Justice is aided by the State Court Administrator, who is appointed by and serves at the pleasure of the Chief Justice. ORS 8.110(2). The Chief Justice may delegate to the State Court Administrator any of the Chief Justice's administrative powers. ORS 1.002(9); ORS 8.125(1). The legislature has specified that, subject to the Chief Justice's direction, the State Court Administrator's responsibilities include, among other aspects of running the state court system: supervising the personnel plan for non-judicial officers and employees of the court; budget preparation and fiscal accounting; property management; continually surveying administrative methods and business activities of the state courts; making recommendations to the Chief Justice based on those surveys; compiling statistical information and reports on court caseloads, workloads, performance, management, expenses and revenues; and establishing and supervising education programs for judges, other officers, and employees of the state courts pertinent to the performance of their work. ORS 8.125(2). To provide the centralized operational and infrastructure services needed for the state court system, the State Court Administrator oversees a large staff that is divided into several functional divisions and programs, such as Budget and Fiscal Services Division, Enterprise Technology Services Division, Human Resource Services Division, and an internal Audit Office.

Currently, OJD has over 1,200 employees, the vast majority of whom work in the circuit courts.[6] The staffing level for each court depends on the volume of work and the number of judges in that court. Some circuit courts have as

---

[6] Each of Oregon's 36 counties has a circuit court. Each circuit court, in turn, is in a judicial district. Most judicial districts have only one circuit court. For those districts, the circuit court's jurisdiction, the district's boundary, and the county's boundary are the same. In the most rural areas of Oregon, however, the judicial districts have more than one circuit court and county in them. As a result, although there are 36 circuit courts in 36 counties, there are only 27 judicial districts. Each judicial district has one presiding judge and one trial court administrator. As ERB noted in its opinion, the witnesses at the hearing typically described trial court administration as though the organizational divisions are by "circuit court" rather than by judicial district, which is *de facto* accurate for 21 of the 27 districts. For ease of reference, ERB, for the most part, followed the witnesses' phraseology. We do the same.

few as five employees; the largest has over 300 (judges and staff combined). The internal organizational structure for each circuit court, however, is the same.

By statute, the circuit courts are organized into judicial districts, each of which is authorized to have a presiding judge. ORS 1.003(1)(b). Presiding judges are appointed by the Chief Justice for two-year terms, after which they may be reappointed or replaced.[7] ORS 1.003(2). The legislature has specified that presiding judges have authority to "[a]pportion and regulate the disposition of the judicial business" of the court (*i.e.*, control the scheduling and assignment of cases to other judges). ORS 1.171(2)(a). Their authority beyond that is delegated by the Chief Justice, who is to

> "permit as much variation and flexibility in the administration of the courts of this state as are appropriate to the most efficient manner of administering each court, considering the particular needs and circumstances of the court, and consistent with the sound and efficient administration of the judicial department of government in this state."

ORS 1.002(5). By Chief Justice rule, presiding judges are accountable to the Chief Justice in the exercise of their administrative authority and are responsible within their respective jurisdictions for "the equitable administration" of all applicable rules and personnel policies. Judicial Department Personnel Rule (JDPR) 1.02(6).

Subject to the Chief Justice's authority to order otherwise, each circuit court also has a trial court administrator (TCA). TCAs are appointed by, and can be removed by, the presiding judges of the respective circuit courts, subject to the Chief Justice's personnel policies for those decisions. ORS 8.195(1)(a). The statutory duties prescribed for TCAs relate mostly to the official proceedings of the courts. *See, e.g.*, ORS 8.225(2) (responsibility for, *inter alia*, keeping and affixing the seal of the court, recording court proceedings,

---

[7] The other circuit court judges of each judicial district can exercise a limited "veto" over the Chief Justice's appointment through a written resolution, signed by a majority of the judges, disapproving the Chief Judge's nominee. The Chief Justice then appoints another judge, and that appointment is final in districts with fewer than five judges; in the remaining districts, the appointment can be vetoed a second time, after which it is final. ORS 1.003(5).

maintaining documents, entering orders, and authenticating records). Under the Chief Justice's rules, a TCA also has supervisory authority over all staff, including judicial staff, for the TCA's respective court, unless the presiding judge in writing specifies otherwise. JDPR 1.02(8). By statute, a court's presiding judge also may delegate any of the administrative powers of that position to that court's TCA. ORS 1.171(4).

C.   *Centralization and Uniformity*

   1.   *Internal court administration*

To establish "an accountable, equitably funded and uniformly administered system of justice," ORS 1.001, the Chief Justice and State Court Administrator, from the outset of the unified court system, centralized policy authority and oversight of all aspects of court infrastructure and administration at their level. To that end, they adopted (and continually update) rules and orders designed to maximize uniformity and consistency in the internal administration of the courts. Much of the desired administrative uniformity is a product of the Judicial Department Personnel Rules that apply to all OJD employees except judges (as elected officials) and the State Court Administrator (who serves at the Chief Justice's pleasure). The rules, which span nearly 200 pages, begin with a "Forward" explaining that their purpose "is to ensure [that] all employees enjoy the same rights and terms of conditions of employment."[8] As ERB accurately described in its order, the JDPRs are

> "a comprehensive set of personnel policies and procedures [that] address matters including classification, compensation, hiring, trial service, performance standards, grievances, disciplinary actions and appeals, layoffs, assignment of work, leaves (including the types of leaves and accrual rates), holidays, and personnel records."

Under the JDPRs, all OJD officers and employees are subject to a uniform classification and compensation plan developed by the Human Resources Division of the State

---

[8] The JDPRs were an exhibit at ERB's hearing and are also online at https://www.courts.oregon.gov/rules/Other%20Rules/JDPR-01-01-2018.pdf (accessed June 1, 2020).

Court Administrator's office.[9] The uniform position classifications are based on general type and level of job duties, authorities, and responsibilities. For each position classification, the compensation range is the same statewide; it does not vary based on location or other court-specific considerations. Within a classification, the specific tasks assigned to a particular position can vary from one court to another, and those variations are reflected in the "position descriptions" drafted by each court. The variations usually are a function of court size, with employees in larger courts typically having narrower or more specialized duties and employees in smaller courts typically having broader or more combined duties. ERB found, however, that, in general, "employees in the same type of position perform similar duties in a similar manner, regardless of which court they are employed in." Whether a particular employee is correctly classified, given the specific tasks and responsibilities that the employee performs, is determined by the State Court Administrator.[10] At the hearing, OJD's Human Resources Director summed up OJD's compensation policy as one to pay employees "who do similar work, the same amount of money *** across the state."

OJD's uniform compensation plan ensures not only equitable pay for the staff, but also "equitable funding" of the individual courts throughout the state. *See* ORS 1.001 (statement of legislative purpose). As ERB found, OJD receives its funding from the legislature as an approved lump sum based on a comprehensive budget request submitted by the Chief Justice. In calculating OJD's budget request, OJD "accounts for all personnel costs, including circuit court employees' compensation." OJD "can easily calculate the circuit courts' personnel costs, in part because

---

[9] To ensure the Chief Justice's broad authority to set compensation and other terms of employment, the legislature specifically exempts all state court officers and employees from the State Personnel Relations Law (ORS chapter 240) that applies to state employees generally. ORS 8.170.

[10] Employees who believe that they have been misclassified based on the work assigned to them may pursue a classification review that culminates with the State Court Administrator. If the State Court Administrator agrees that an employee is working out of class, the presiding judge and TCA for the court involved must either promote that employee to the proper classification or remove the job duties that do not conform to the employee's classification.

payroll is centralized and classification compensation rates are [the same] statewide." Funds are then allocated to the individual circuit courts on essentially a pro rata basis. The uniformity of compensation across the state courts ensures that each court, relative to its size, can afford the same level of staffing and deliver the same level of court services to the public.

In addition to compensation, ERB identified other basic terms and conditions of employment that are set through the JDPRs and apply uniformly to all OJD officers and employees. For example, all court officers and employees receive the same employment benefits (*e.g.*, medical, dental, and insurance) and participate in the same retirement system. The types of leave that they receive (*e.g.*, vacation, sick, family, and personal time) and the rates of leave accrual are uniform. All workers' compensation claims are handled directly by the Human Resources Division rather than through the court for whom an employee works. All disciplinary action is subject either to the State Court Administrator's immediate authority or subsequent oversight.[11] In addition to those uniform policies noted by ERB, the JDPRs address a wide range of other terms and conditions of employment as well, such as policies on equal employment opportunity (JDPR 5); recruitment, selection, and trial service (JDPR 6); performance standards and feedback (JDPR 7); layoffs (JDPR 11); resignations and job abandonment (JDPR 12); work weeks and breaks (JDPR 13); family and personal workplace relationships (JDPR 18); and political activity (JDPR 21).

## 2. *Uniformity of judicial procedures*

A second means of achieving a uniform justice system in Oregon has been to standardize the procedures and

---

[11] As ERB found, the only disciplinary action that a presiding judge or TCA may take without first consulting the State Court Administrator's office is a written reprimand. A written reprimand, however, is subject to a grievance process by which the employee may challenge that disciplinary action and have it reviewed by the Human Resources Director or the State Court Administrator. All other disciplinary actions—such as pay reductions, suspensions, and dismissals—must be taken in consultation with the Human Resources Division. For all disciplinary actions, the employee may pursue a formal appeal process before an independent board of judges, supervisors, and nonsupervisory employees appointed by the Chief Justice. JDPR 10.02 (appeals board composition).

practices for conducting judicial business. In general, all courts must be open during standard business hours, with only minor deviation from those hours as approved by the Chief Justice or State Court Administrator, such as a court's exact opening and closing times, whether it remains open over the lunch hour, or whether it is open for operation of a night court. Court closures for holidays are uniform. JDPR 17.01-.02 (declaring dates of observed holidays and incorporating holidays designated in ORS 187.020). The immediate decision to close a court due to inclement weather is made at the local circuit court level by the presiding judge, but it must be made pursuant to and consistently with detailed protocols and criteria set by order of the Chief Justice. The State Court Administrator, through the Security and Emergency Preparedness Office (former title; now Marshall's Office), provides standardized security training to all OJD judges and court employees, sets minimum safety requirements for all of the state's courts, and sometimes provides funding or other resources to meet an individual court's particular security needs. The Chief Justice can also order special court closures on a temporary basis for emergencies, which, as ERB noted, happened when severe budget constraints resulted in statewide court closures on Fridays for a period of time.[12]

State court procedural practices likewise have become more consistent pursuant to the Chief Justice's authority under ORS 1.006 to "prescribe by rule the form of written process, notices, motions and pleadings" in civil and criminal proceedings in state courts. The Chief Justice has exercised that authority by promulgating the Uniform Trial Court Rules (UTCRs), which, with only a few exceptions, "apply uniformly to all proceedings and actions in circuit court[.]" UTCR 1.010. As accurately described by ERB:

"The UTCRs govern the broadest matters in the court system such as standards for pleadings and documents,

---

[12] More recently, the Chief Justice has had to implement far-reaching measures statewide in response to the COVID-19 pandemic, postponing all nonessential judicial proceedings, limiting public access to courts, reducing staffing at the courthouses, and taking other steps to reduce the risk of contagion to the public and court staff. *See, e.g.*, Chief Justice Order No. 20-006 (Amended) (Mar 27, 2020).

decorum in proceedings, case management, and calendaring. They also address the proper procedures in small claims court, complex litigation, contempt proceedings, juvenile court proceedings, domestic relations proceedings, criminal cases, civil cases, and trials."

An even greater level of uniformity in statewide court "business practices" has been achieved with the implementation of Oregon "eCourt." The eCourt system is an integrated technology system for case management; public access services, such as ePayment, eFiling, and case searching; centralized financial management; and document management, among other features. The system has "affected nearly every workflow, every business process, every staff person, trial court administrator, and every judge in Oregon's circuit courts[.]" Oregon Judicial Branch, *2016 Annual Report: Focus on Technology* 9 (Oregon Judicial Department 2017) (Ex. R-21). As ERB found:

> "Oregon eCourt has made the business processes, forms, and data entry practices that are used throughout the various courts more streamlined and uniform. The eCourt system has also further integrated the courts by, for example, enabling employees to access documents or accept payments for a case in a different circuit court."

The eCourt system has thus accomplished tighter statewide integration of the courts' work, not just in terms of *how* that work is done, but also *what* is done, so that staff in every court can immediately determine if, for example, a person before their court is subject to a restraining or child custody order or is already on a payment schedule elsewhere in the state. That enhanced functional integration effectively permits each circuit court to immediately coordinate their orders with every other circuit court in a way not previously possible.

The fact that circuit courts throughout the state perform substantially the same work, using largely standardized practices and procedures, is important to the judiciary's ability to provide "business continuity" despite unexpected disruptions or emergencies. A central objective of unifying Oregon's state courts was to ensure that all judges and court employees are "statewide resources," who are able

to perform the work of any court anywhere in the state, which in turn ensures the equitable operation of all courts throughout the state. To that end, as already described, the Chief Justice has the authority to assign or reassign all staff and judges.[13] That authority was used, for example, when several Clatsop County Circuit Court employees became ill during a flu outbreak. Tillamook County Circuit Court staff were brought into Clatsop County Circuit Court to help, which they did; first, however, the Tillamook staff had to be trained on various different case practices and procedures that the Clatsop staff used under the state court's older technology system, which permitted considerable court-by-court customization. With the statewide implementation of eCourt, which had been recently accomplished at the time of ERB's hearing in this case, OJD has moved much closer to realizing the goal of having all staff and judges be statewide resources to the court system. ERB specifically found that, although some "minor variations" among the circuit court's business processes and procedures still exist, eCourt in particular had significantly advanced OJD's ongoing efforts "to limit or reduce the variation among the circuit courts' rules and practices" and that OJD expected that uniformity to continue to increase in the future.

D.    *Some Flexibility at the Circuit Court Level*

In limited areas, administrative policies and procedural practices at the circuit courts may permissibly vary. In general, the Chief Justice tries to give the presiding judges and TCAs "reasonable flexibility" in ways that will advance the goal of efficient delivery of judicial services, while maintaining the uniformity necessary for an "accountable,

---

[13] Beginning with Chief Justice Peterson in the initial years of the unified court system, each Chief Justice has maintained a standing order making each appointed or elected judge a pro tem judge for every circuit court in the state. A judge therefore can, without procedural delay and as needed, immediately assist another circuit court outside of the judicial district where the judge is elected or appointed to serve. As then-Chief Justice Balmer described at the hearing, in Oregon's most rural counties, the need for cross-circuit court assistance arises frequently because, for example, a judge in one rural county may have a multiday trial or a conflict. In that event, on a pro tem basis, a judge in a nearby circuit, by video or otherwise, can preside for a case, a motion ruling, a settlement conference, or a plea, and that judge's staff can handle all the procedures involved.

equitably funded and uniformly administered," ORS 1.001, single statewide court system.

In terms of court procedural practices, each court has Supplementary Local Rules (SLRs) that must be consistent with the UTCRs and are approved by the Chief Justice. SLRs typically address matters such as the scheduling of cases (*e.g.*, when *ex parte* or in-custody hearings are held); whether the court is open or closed over the lunch hour; and localized differences in the traditional ways some judges or counties have handled certain kinds of issues (*e.g.*, parenting plans). SLRs also sometimes reflect differences in the availability (or lack) of local resources that are beyond OJD's control, such as outside health care providers, drug rehabilitation services, mediators, and social services. Over the years, with increases in standardized business practices in general and with the implementation of eCourt in particular, the role for SLRs has declined and predictably will continue to do so into the future.

In terms of personnel policies, the JDPRs also accord the circuit court presiding judges and TCAs latitude in some areas. As ERB described, in some instances the presiding judge or TCA is able, under the JDPRs, to select from specified options; in other areas, they may have discretion to exercise judgment:

"For example, each circuit court administration may decide whether to provide their employees with performance evaluations; whether to compensate their employees for overtime by cash payment or compensatory time; whether to grant or deny their employees annual salary increases;[14] and whether to adopt a Flexible Employee Recognition Plan.[15] Additionally, each circuit court administration has

_____

[14] As the dissenting member explained, unless an employee is at the top of the salary range for a particular classification, an annual salary increase may be denied only after giving the employee written notice of the reason for the denial, such as the failure to meet the conduct and performance standards set by the JDPRs. JDPR 4.03(3)(c)(ii).

[15] ERB further explained that a Flexible Employee Recognition Plan "permits a circuit court administration to recognize outstanding employee performance with gift cards or sponsored social events. If a court administration decides to adopt such a plan, they must choose from a set of plan options provided by the State Court Administrator, and the plan must be approved by the State Court Administrator." To implement such a plan, a circuit court must form a

> substantial discretion over their employees' schedules, *e.g.*, they decide whether to allow employees to have part-time or flexible work schedules. Each circuit court administration also has discretion over various leave issues, including the standards or criteria by which leave requests will be granted or denied; the order in which their employees may use various types of leave; whether their employees may use sick leave to care for certain persons who do not meet the standard definition for qualified family members; and whether their employees may receive donations of paid leave."

(Original footnotes omitted.) Other examples include authority at the circuit court level to reorganize work assignments among the respective court staff; whether to fill a vacancy through open competition or through internal OJD-only announcement; and whether to deal with a major budget shortfall by laying off employees, leaving vacancies open, or reducing some employees to part-time status.

Those and all other areas of administrative flexibility and discretion at the circuit court level are never completely unconstrained, however. All circuit court administrative authority must be exercised consistently with the JDPRs. For some local court decisions, varying degrees of central oversight are built in. For example, if a presiding judge and TCA opt to reduce staff due to a budget shortfall, they must prepare a layoff plan for approval by the State Court Administrator and must follow the JDPR layoff rules, which include, among other provisions, layoff order and notice requirements, as well as employee displacement (bumping) rights. As another example, in filling vacancies, the JDPRs specify criteria and procedures for all recruitment methods; for recruitment from outside of OJD, the rules require close coordination with the Human Resources and Fiscal Divisions of the State Court Administrator's office. And beyond those and other explicit constraints is the Chief Justice's plenary authority as the administrative head of Oregon's uniform state court system, complete with

---

committee of local court staff to recommend what awards should be given under the plan and then to review and approve those awards. The plan must be posted and each circuit court has the same maximum percentage of its budget to use to fund the recognition awards.

the power to issue all rules and orders appropriate to her role. ORS 1.002(1)(a). Given that authority, the Chief Justice effectively can reverse, modify, or supplant any exercise of circuit court administrative discretion at any time, thus rendering all such exercises subject to the Chief Justice's ultimate control.

Finally, OJD has structured training and information exchanges among the staff of the various state courts in ways that both formally and informally facilitate standardization and uniformity in areas where local prerogatives remain. As ERB found, OJD has standing committees and workgroups comprised of volunteer judges, administrators, and other employees from the various courts who meet to exchange ideas and make recommendations on court policies and practices. One example was the Court Re-engineering and Efficiencies Workgroup (CREW), which for several years generated suggestions on how to improve efficiency and consistency in circuit court operational practices. Other examples have included Peer Information Exchanges, Process Improvement Teams, a classification advisory committee, an advisory policy committee, and a local forms committee.

Also, the Chief Justice meets at least twice a year, and sometimes a third time, with the presiding judges as a group. The TCAs also meet as a group at least two to three times a year. In those meetings, presiding judges and TCAs exchange ideas and experiences with their peers on "best practices" so that circuit courts are all "on the same page" as much as possible. And, through the Communication, Education and Court Management Division (former title; now Office of Policy and Education), OJD provides optional (and sometimes mandatory, as with eCourt) training programs for supervisors and employees statewide. Those include, for example, centrally and regularly held employee orientations for new court employees from across the state, which are voluntary but are attended by the vast majority of new employees. Another example is the OJD "Clerk College," through which, in a university-like setting over a three-day period, court staff can take classes on a variety of subjects, such as processing different kinds of cases or developing "soft skills" like customer service communication and writing abilities.

E.   *Yamhill County Circuit Court*

The Yamhill County Circuit Court has one presiding judge, three other judges, and a TCA. Excluding the judges, the TCA, and a staff person charged with supervision of court operations, Yamhill County Circuit Court has 27 employees. Judicial assistants and courtroom clerks are jointly supervised by the judges and the TCA; they work on the second floor of the courthouse. Other employees, including cashiers and clerks, generally work on the first floor of the courthouse and are supervised by the TCA and a court operations supervisor. Although it is possible for circuit court employees to seek positions in and transfer to other courts, Yamhill County Circuit Court employees have not commonly done so. In the past 12 years, only two or three employees have transferred between Yamhill and other state circuit courts.

ERB found that, although the Yamhill court employees occasionally interact with employees in other courts, those interactions are not a regular part of their work. They occur, for example, when employees participate in centralized OJD trainings or Peer Information Exchanges. Also, because the Yamhill County Circuit Court was the pilot court for eCourt, some of the Yamhill staff went to other circuit courts to help their staff train as eCourt was implemented statewide. Similarly, some Yamhill staff went to Benton County Circuit Court for mentoring when the Yamhill County Circuit Court decided to adopt a calendaring system similar to Benton County's. For the most part, however, the Yamhill court employees work only in their own courthouse and with each other, and have only limited interactions with the employees of the other circuit courts.

ERB made several specific findings about particular administrative policy and procedures decisions made by the Yamhill County Circuit Court Presiding Judge and TCA. Because of their significance to the issues in this case, we quote ERB's findings in that regard:

"55.  Employees in the Yamhill County Circuit Court have been dissatisfied with certain policies and practices adopted by the trial court administrator or presiding judge. In some cases, the trial court administrator has denied

employees' leave requests based on unwritten standards, including, for example, her preference that employees accumulate substantial sick and vacation leave balances before using leave.

"56.    The Yamhill County Circuit Court administration has the discretion to require part-time employees to switch to full-time or resign, and has exercised that discretion.

"57.    The Yamhill administration has adopted a policy generally eliminating employees' ability to work 'adjusted work hours,' also known as 'flex time.' Previously, when flex time was permitted, employees could adjust their regular schedule for a particular workday or workweek (for example, an employee could arrive at work 15 minutes early and leave work 15 minutes early on a certain day).

"58.    The Yamhill County Circuit Court administration has the discretion to deny employees' requests for flexible work schedules, and has exercised that discretion. For example, they denied an employee's request for a flexible schedule (with an earlier start and end time) to accommodate her childcare issues. In another case, a judicial assistant asked if she could work on a flexible schedule because her daughter had been seriously injured and would require a lot of long-term care. Initially, she was told that she could keep her judicial assistant position and adopt a flexible schedule when she returned from her leave of absence. However, upon her return to work, she was told that was no longer an option. The administration said she could either continue working as a judicial assistant without a flexible schedule, or move to a clerk position with more flexibility.

"59.    The Yamhill County Circuit Courthouse does not have its own parking structure. Employees may use a nearby public parking garage, but due to safety concerns, many employees prefer to park on the street instead of the garage. Recently, however, the presiding judge issued an order prohibiting courthouse employees from parking on the streets directly adjacent to the courthouse, in an effort to make those spots available for members of the public.

"60.    On one occasion, a Yamhill County Circuit Court employee anonymously reported to HR Services that the Yamhill administration was going to close the courthouse the day after Thanksgiving and require all of the employees to take leave. The State Court Administrator intervened, and the courthouse remained open."

F.  *History of Collective Bargaining*

AFSCME has attempted at least three times—30 years, 14 years, and 6 years before ERB's hearing in this case—to organize all OJD's employees into a single state-wide bargaining unit (a so-called "wall to wall" bargaining unit). The Service Employees International Union has also "more than once" made efforts to organize a wall-to-wall bargaining unit of OJD employees. AFSCME representatives who were involved in efforts to form a wall-to-wall OJD bargaining unit believed those efforts had failed because employee concerns and priorities differed from "court to court, due to regional differences in culture and economic conditions (such as the cost of living), as well as differences in the employees' court specific working conditions, the sizes of their courts, and their relationships with their court administrators and judges."

## II.    LEGAL PRINCIPLES

As we have described, AFSCME petitioned ERB to certify a bargaining unit comprised of the 27 nonsupervisory OJD employees working in the Yamhill County Circuit Court. OJD objected to the certification contending that, under the applicable criteria, the proposed employee group was too small a segment of OJD's workforce to be an "appropriate" bargaining unit. ERB concluded otherwise and ordered the certification, which resulted in OJD's petition for review. We begin with a general overview of the legal standards that apply to ERB's certification decision, which provides context for ERB's decision and the parties' respective arguments on review.

A.  *Controlling Legal Principles*

The legislature enacted PECBA with the declared purpose of "providing a uniform basis for recognizing the right of public employees to join organizations of their own choice, and to be represented by such organizations in their employment relations with public employers[.]" ORS 243.656(6). As already noted, under PECBA, Oregon public employees may exercise their right to join a labor organization of their choice without any action by ERB. But a labor organization can become the exclusive bargaining

representative for a group of employees—one with which their public employer must bargain—only through ERB certification or voluntary recognition by the public employer. ORS 243.666(1). Because OJD has not recognized AFSCME as the exclusive bargaining representative for the 27 non-supervisory employees in the Yamhill County Circuit Court, this case involves ERB's certification authority.

1.  *The appropriate unit determination*

For ERB to certify a labor organization as the exclusive representative of a group of public employees, ERB must determine that the group of employees who desire to be represented by a particular labor organization would comprise an "appropriate bargaining unit."[16] *See* ORS 243.650(1) (defining "appropriate bargaining unit" to include "the unit designated by [ERB] to be appropriate for the purpose of collective bargaining"); ORS 243.682 (setting out procedures and criteria for ERB's designation of group of employees as an "appropriate bargaining unit"). By statute, in making that determination, ERB must "consider such factors as community of interest, wages, hours and other working conditions of the employees involved, the history of collective bargaining, and the desires of the employees." ORS 243.682(1)(a). Also by statute, ERB may "determine a unit to be the appropriate unit in a particular case even though some other unit might also be appropriate." *Id*. Thus, as ERB has observed, it is not required to certify "*the* most appropriate unit, only *an* appropriate unit." *E.g.*, *AFSCME v. Douglas County*, 26 PECBR 358, 388 (2015) (emphasis in original). That does not mean, however, that *any* unit is appropriate. For a unit to be an appropriate one, ERB must apply the statutory criteria in a way that "best effectuates the purposes and policies of PECBA." *Assoc. of Public Employees v. OSSHE and OPEU*, 10 PECBR 883, 888 (1988).

---

[16] The desires of the employees to be represented by a petitioning labor organization are determined either through an election after unit certification or by a showing, verified by ERB, that a majority of the employees at the petition stage have already indicated their support. *See generally* ORS 243.682 (2) - (4) (procedural requirements to petition for representation election and certification without election). In this case, AFSCME supported its petition with the requisite showing of advance majority support and sought certification without election.

Oregon is not unique in using the "appropriate bargaining unit" as the organizing principle for public sector collective bargaining. That unit model concept originated under the National Labor Relations Act (NLRA) for the private sector and has been adopted by virtually every state for public sector collective bargaining.[17] Traditionally, the National Labor Relations Board (NLRB) has assessed the appropriateness of proposed bargaining units under a "community of interest" doctrine that groups together employees based on the "mutuality" of their interests in "wages, hours, and other conditions of employment."[18] For both private and public sector collective bargaining, unit determination is generally regarded as being "of fundamental importance," because that determination is "both a prerequisite to negotiations and a vital factor in their structure and outcome." Lee C. Shaw & R. Theodore Jr. Clark, *Determination of Appropriate Bargaining Units in the Public Sector: Legal and Practical Problems*, 51 Or L Rev 151, 152 (1971). Unit determination has particular importance in the public sector:

> "In the public sector, the scope and nature of the unit found to be appropriate will * * * affect the range of subjects which can be negotiated meaningfully, the role played in the process by the separate branches of government, the likelihood of peaceful resolution of disputes, order versus chaos in bargaining, and ultimately, perhaps, the success of the whole idea of collective bargaining for public employees."

Eli Rock, *The Appropriate Unit Question in the Public Service: The Problem of Proliferation*, 67 Mich L Rev 1001, 1001 (1969). ERB likewise has characterized the appropriate unit determination under ORS 243.682 as "integral" to the collective bargaining rights and policies that PECBA furthers. *Assoc. of Public Employees*, 10 PECBR at 888.

---

[17] Andria S. Knapp, *Anatomy of a Public Sector Bargaining Unit*, 35 Case W Res L Rev 395, 404 (1985). *See generally* Marcus R. Widenor, *Public Sector Bargaining in Oregon: The Enactment of the PECBA*, 8 LERC Monograph Ser 1, 17 (1989) (PECBA modeled on NLRA and was intended, among other goals, to "rationalize the determination of bargaining units" among public employees).

[18] *Allied Chem. & Alkali Workers of Am., Local Union No. 1 v. Pittsburgh Plate Glass Co., Chem. Div.*, 404 US 157, 172, 92 S Ct 383, 30 L Ed 2d 341 (1971) (discussing NLRB test (citing 15 NLRB Annual Report 39 (1950))).

2.  *Factors in determining whether a unit is "appropriate"*

Although ORS 243.682(1)(a) lists "community of interest" as a "factor" to be considered, ERB in practice has treated it, consistently with the traditional NLRB "community of interest" doctrine identified above, as a "comprehensive term that encompasses other factors listed" in the statute (*i.e.*, wages, hours, other working conditions). *E.g.*, *Dept. of Administrative Services v. AFSCME*, 15 PECBR 786, 795 (1995). By the statute's terms, the list of factors for ERB to consider are not exclusive. Through the directive for ERB to consider factors "such as" those listed in the statute, ERB has interpretative authority through rulemaking—both formally promulgated rules and policies adopted through case adjudication—to consider other factors of like character and to refine the listed criteria consistently with the statute's generally expressed legislative policy. *See Springfield Education Assn. v. School Dist.*, 290 Or 217, 225-30, 232-33, 621 P2d 547 (1980) (discussing general principles of agency interpretative authority and analyzing ERB's authority under PECBA in particular); *U of O Chapter, AFT v. U of O*, 92 Or App 614, 619, 759 P2d 1112 (1988) (acknowledging ERB's interpretative authority under ORS 243.682(1)).

ERB traditionally has interpreted "community of interest" to encompass, in addition to wages, hours, and working conditions, "similarity of duties, skills, benefits, interchange or transfer of employees, promotional ladders, common supervision, etc." *Douglas County*, 26 PECBR at 388 (citing former ERB rule).[19] And, by rule, ERB has provided that a bargaining unit, if otherwise an appropriate one under the relevant criteria, "may consist of all of the

---

[19] ERB's interpretative expansion of the term "community of interest" is consistent with the federal law-derived community of interest factor that PECBA adopted. *See AFSCME Council 75 v. City of Lebanon*, 360 Or 809, 817, 825, 388 P3d 1028 (2017) (PECBA is patterned after the NLRA in many respects; federal cases interpreting NLRA can provide guidance in interpreting parallel provisions of PECBA). Under federal law, in addition to wages, "community of interest" typically encompasses considerations such as "similarity of duties, skills, working conditions, and benefits; the employer's organizational structure including supervision; the distinctiveness of the functions performed; and the extent to which work processes are integrated." Shaw & Clark, *Determination of Appropriate Bargaining Units in the Public Sector: Legal and Practical Problems*, 51 Or L Rev at 164 (citing representative cases; footnote omitted).

employees of the employer, or any department, division, section or area, or any part or combination thereof[.]" OAR 115-025-0050(1).

Through case adjudication, ERB has identified other relevant policy-based factors as well. Particularly "prominent" among them is ERB's well-established policy of non-fragmentation of public workplaces. *Oregon Workers Union v. Dept. of Transportation and SEIU*, 21 PECBR 873, 883 (2007) (internal quotes and citations omitted). As ERB has explained, fragmentation is "inimical to stable labor relations under PECBA" and harms both the public employees' and employers' interests alike. *Assoc. of Public Employees*, 10 PECBR at 889. In terms of the employees' interests:

> "The creation of multiple splinter units of a public work force waters down the bargaining power of affected employees to the point where bargaining becomes an exercise in futility. The multiple small groups can be played one against the other in a whip-saw fashion to make a charade of the bargaining process. In the case of multiple small bargaining units of strike-permitted employees, little incentive exists to resolve differences under the bargaining procedures established by the PECBA, as the threat of strike by such small groups would be of little consequence to public employers. Thus, fragmentation into multiple units serves to destroy rather than preserve parity of bargaining power which [the PECBA] seeks to establish."

*Id*. In terms of employers' interests, avoiding fragmentation "promotes workplace stability and prevents the undue burden [that] would fall on public employers if they had to engage in bargaining sessions for the many splinter groups on a round-robin basis." *Oregon Workers Union*, 21 PECBR at 883 (internal quotes and citation omitted).[20] For the public generally, because more bargaining units increase the potential for labor disputes that can result in work stoppages, avoiding fragmentation serves the PECBA goal of

---

[20] "Undue burden" on the public employer includes not only the time and resources needed to bargain with (and later administer the multiple contracts with) a number of different bargaining units, but also the potential for the employer to be "whipsawed" as a result of different labor organizations competing for higher and better contract settlement packages. *See, e.g.*, *Div. of State Lands Employees Assoc. v. Div. of State Lands*, 7 PECBR 6118, 6129 (1983) (discussing nonfragmentation policy).

minimizing impairment or interruption of necessary public services. *Id*.

As a well-established corollary to its nonfragmentation policy, ERB also has a policy-based preference for certifying the "largest possible appropriate unit," which a "wall-to-wall" bargaining unit carries out to the "fullest extent." *Welches Education Assn. v. Welches School Dist.*, 12 PECBR 304, 311, 311 n 7 (1990), *aff'd*, 116 Or App 564 , 842 P2d 437 (1992). That preference rests on the pragmatic recognition that "[l]arger units tend to *better* equalize bargaining power" and most fully advance PECBA's objectives of efficient bargaining, stable labor relations, and uninterrupted public services. *Oregon Workers Union*, 21 PECBR at 883 (emphasis added). ERB's nonfragmentation and largest-possible-appropriate-unit policies are thus grounded in the same statutory goals and purposes. *U of O*, 92 Or App at 618.[21]

### 3.   *ERB's adjudicative role and appellate court review*

For many bargaining unit determinations, the decision whether to certify a particular proposed unit requires ERB, after considering the relevant criteria, to "balance competing policies of the PECBA: *e.g.*, the promotion of labor relations stability and the equalization of bargaining power versus the right of employees to choose an exclusive

---

[21] The two policies, although complementary, are not the same. *See Oregon Workers Union*, 21 PECBR at 883 n 5, 883-84 (declining to consider "wall-to-wall" preference while still considering nonfragmentation policy). ERB's policy favoring a wall-to-wall (or other largest appropriate) unit is a preference to certify the "most" appropriate unit possible. *See, e.g.*, *Oregon Nurses Assn. v. Or. State Bd. Of Higher Educ.*, 8 PECBR 6716, 6716 (1984) (order on reconsideration) (describing ERB's goal on case-by-case basis to move state's historically highly fragmented workforce into "most" appropriate—*i.e.*, largest possible—bargaining unit or units). It reflects ERB's permissible choice to require more than the legislative minimum for the appropriate unit determination and thus to maximize the purposes that PECBA serves. *See* ORS 243.682(1)(a) (ERB may determine unit to be appropriate "even though some other unit might also be appropriate"). Fragmentation, on the other hand, compromises, and at some point defeats, the PECBA policies that unit determination serves. *See Assoc. of Public Employees*, 10 PECBR at 888-89 (discussing various ways that undue fragmentation frustrates PECBA's goals). Fragmentation is a factor that weighs against finding a proposed unit to be "an appropriate" one, not just a factor that makes the proposed unit less appropriate than some other. *See, e.g.*, *IBEW v. Eugene Water & Electric Board*, 23 PECBR 739, 765 (2010) (separate bargaining unit of only nine of about 350 unrepresented employees would fragment workforce, which disfavors certification).

representative." *OPEU v. Corrections Dept. and Exec. Dept. and AFSCME*, 12 PECBR 876, 889-90 n 17 (1991). Like other administrative bodies, ERB "possesses the collective expertise of its members" along with the expertise developed "by virtue of its administrative function"; it is expected to use its expertise in evaluating and understanding the evidence in the cases that come before it. *Rolfe v. Psychiatric Security Review Board*, 53 Or App 941, 948, 951, 633 P2d 846, *rev den*, 292 Or 334 (1981) (discussing the Psychiatric Security Review Board's expertise and adjudicative role); *see* ORS 240.060(1) (identifying background, experience, and interest required for governor's selection of ERB members). Thus, ERB's adjudicative role is typical of administrative decision-making in general: It blends factfinding with subject-matter expertise.

But, as is also true of other agencies, ERB's orders are subject to judicial review. *City of Hermiston v. ERB*, 280 Or 291, 294, 570 P2d 663 (1977). The standard of our review is the same as for other administrative bodies. This court does not weigh the evidence anew or otherwise judicially interfere with how ERB evaluates, weighs, and balances competing criteria to reach a decision. *U of O*, 92 Or App at 620 (ERB weighs factors bearing on unit determination "free of judicial intervention"); *OSEA v. Deschutes County*, 40 Or App 371, 376, 595 P2d 501 (1979) (weight to be given various criteria in a given case is for ERB, not reviewing court); *see* ORS 183.482(7) (reviewing court shall not substitute its judgment for that of agency on any issue of fact). We do, however, review ERB's decisions for substantial evidence and substantial reasoning. *Deschutes County*, 40 Or App at 376. And the nature of that review is the same as for other administrative bodies:

> "Substantial evidence to support a finding of fact is evidence that, viewing the record as a whole, would permit a reasonable person to make that finding. ORS 183.482(8)(c); *Armstrong v. Asten-Hill Co.*, 90 Or App 200, 206, 752 P2d 312 (1988). In reviewing for substantial reason, however, we go one step further: We examine not only the evidence that supports ERB's findings but also the reasoning that leads ERB from the facts that it has found to the conclusions that it draws from those facts. *See Drew v. PSRB*, 322 Or 491, 500, 909 P2d 1211 (1996). Specifically, we review

ERB's reasoning for whether ERB correctly interpreted and applied legal principles in the individual case before it, and whether it did so consistently with other similar cases rather than arbitrarily or *ad hoc*. *Id*."

*Portland Assn. of Teachers v. Mult. Sch. Dist. No. 1*, 171 Or App 616, 627, 16 P3d 1189 (2000).

### III.   ERB'S DECISION

As earlier noted, ERB issued a split decision in this case, with two members joining in the order certifying the proposed unit and one member authoring a dissent. In its order, the majority (ERB) first set out its factual findings on which our description of historical facts is based and then analyzed whether the proposed unit is appropriate under the basic legal principles that we have outlined. ERB began with the "community of interest" factor under ORS 243.682(1)(a), which encompasses the statutory factors of wages, hours, and other terms of employment, as well as similarity of duties, skills, benefits, interchange or transfer of employees, promotional ladders, and common supervision. As ERB explained, when, as here, the proposed unit excludes other employees of the same employer, the community of interest factor subsumes two questions: (1) whether the employees in the proposed unit have a "shared" community of interest with each other; and (2) whether their shared community of interest is sufficiently "distinct" from the interests of the excluded employees to warrant the proposed separate bargaining unit. *E.g.*, *IBEW v. Eugene Water & Electric Board*, 23 PECBR 739, 765 (2010) (assessing whether shared interests of employees in proposed unit were "substantially different" from, and therefore distinct from, interests of employees excluded from unit); *AFSCME v. Washington County*, 20 PECBR 745, 755-56 (2004) (similar).

In this case, there was no dispute that the 27 employees in the proposed unit share a community of interest. ERB therefore focused on the extent to which their shared interests are "sufficiently distinct so that those employees alone constitute an appropriate bargaining unit." ERB acknowledged that all OJD employees are supervised at the highest levels by the Chief Justice and the State Court Administrator and are subject to the same personnel rules

and the same classification, compensation, and benefits plans. ERB likewise acknowledged that all OJD employees working in courthouses throughout the state have similar job duties, work hours, and workplaces. More important in ERB's view, however, was that the Yamhill court employees work in relative physical and social isolation from other state court employees and are subject to "day-to-day working conditions" that their presiding judge and TCA have discretion to set, such as policies for use of accrued leave time, adjustments to work hours, and limitations on flex and part-time schedules. Comparatively, ERB concluded, "the Yamhill employees' community of interest is significantly stronger than, and distinct from, their community of interest with other Department employees."

ERB then turned to the two other pertinent statutory factors. AFSCME's petition included a showing that a majority of the Yamhill employees supported the proposed bargaining unit, which satisfied the "desires of employees" factor. Next, ERB considered the "history of collective bargaining" for the OJD workforce. ERB inferred from that history that the past unsuccessful organizing efforts (30 years, 14 years, and 6 years before this petition) reflected the existence of current impediments to organizing a wall-to-wall bargaining unit for all representable OJD employees.

As a final prong of its analysis, ERB considered in tandem its preference for the largest possible bargaining unit and its corollary policy of avoiding undue fragmentation. ERB agreed that a wall-to-wall unit would be "much more preferable, especially in light of [OJD's] efforts to increase uniformity in court operations and thereby improve the court's efficiency and accessibility." Citing past decisions, however, ERB emphasized that its preference for the largest possible bargaining unit should not be automatically applied in a way that would eliminate consideration of the statutory factors and unreasonably take precedence over the representation rights of employees.[22] ERB agreed with OJD that

---

[22] *See, e.g.*, *Douglas County*, 26 PECBR at 391 (preference should not be "blindly applied" but should be weighed along with statutory factors); *IUOE v. Deschutes County Public Works*, 10 PECBR 906, 919 (1988) (nonstatutory policies should not be applied "automatically" in a way that frustrates employee desires for representation without furthering other purposes underlying PECBA).

undue fragmentation would result if OJD's workforce were to be organized on a judicial "district-by-district" approach so that OJD potentially might have to bargain with as many as 27 different bargaining units. ERB disagreed, however, that fragmentation would be "the necessary result of finding the petitioned-for unit appropriate," and gave several reasons for its disagreement, which we later discuss in detail.

ERB concluded:

"After weighing all of the unit determination factors, including our preference for larger units, we ultimately conclude that the proposed unit is an appropriate one. The petitioned-for employees have a strong and sufficiently distinct community of interest, and they share certain localized working conditions. We also give more weight to their desire to be represented, in light of past attempts to organize a wall-to-wall unit."

In a detailed dissent, the dissenting member explained her disagreement with "four aspects of the majority opinion." First, and "[m]ost fundamentally," the dissenting member would have given much greater weight to ERB's preference for the largest possible appropriate bargaining unit. The dissenting member extensively discussed and documented the history of the preference, which is rooted in what ERB has characterized as the "unique history" of state employee organizing and bargaining, including the fragmentation that existed before and in the early years after PECBA's enactment. *See Div. of State Lands Employees Assoc. v. Div. of State Lands*, 7 PECBR 6118, 6122, 6129 (1983) (describing history).[23] Given the "significance [of the preference] in the development of orderly labor relations in

_____

[23] The problem of fragmentation, although having a history "unique" to state (as opposed to city and county) employee organizing and bargaining in Oregon, is not a problem unique to Oregon. Fragmentation has been endemic to public sector collective bargaining throughout the nation; many jurisdictions, either legislatively or administratively, have created wall-to-wall or other large unit preferences in response. *See generally* Knapp, *Anatomy of a Public Sector Bargaining Unit*, 35 Case W Res L Rev at 397-404 (discussing fragmentation in public sector collective bargaining and legislative and administrative solutions); Shaw & Clark, *Determination of Appropriate Bargaining Units in the Public Sector: Legal and Practical Problems*, 51 Or L Rev at 154-61, 163-64 (same); Rock, *The Appropriate Unit Question in the Public Service: The Problem of Proliferation*, 67 Mich L Rev at 1001 (discussing general problem of fragmentation in public sector collective bargaining).

State governance," the dissenting member would have given the preference particular weight in the context of this "operationally integrated State employer" that provides a "single statewide service" of a uniform court system, with employees who "perform essentially the same duties using essentially the same skills" throughout the state.

Relatedly, the dissenting member disagreed with the majority's assessment of the risk of future fragmentation. In her view, the majority's willingness to certify such a small bargaining unit of OJD's overall workforce did not provide the level of confidence that ERB has required in other cases to ensure that potential future bargaining units would be "relatively limited."[24]

Next, at some length, the dissenting member set out her reasons for disagreeing with the majority's ultimate finding that the employees in the proposed unit have a strong and sufficiently distinct community of interest to constitute an appropriate separate bargaining unit. She went through each of the Yamhill court-specific personnel policies identified by the majority (*e.g.*, flex time, use of leave, part-time employment) and explained why she disagreed that they amounted to community of interest that is both stronger than and distinct from the interests of other OJD employees.

Finally, the dissenting member disagreed with the majority's conclusion that the previous efforts to organize a wall-to-wall bargaining unit of OJD employees should carry weight in the analysis. The most recent wall-to-wall effort had been six years before and the record contained no evidence of any attempt to organize "on any other basis other than a wall-to-wall basis," such as a regional one. The dissenting member declined to infer from that history that the barriers to representation for this group of employees compelled certification of such a small bargaining unit.

---

[24] As examples, the dissent cited *AFSCME v. Washington County*, 25 PECBR 466, 476 (2013) (dismissing petition because small unit certification provided "no confidence" that it would not lead to fragmentation) and *LIUNA v. City of Keizer*, 18 PECBR 476, 484-85 (2000) (approving proposed smaller bargaining unit for group of employees because employer already had to bargain with two other units; third unit would not be added burden).

## IV.  ISSUES AND ANALYSIS ON REVIEW

On review, OJD raises two challenges to ERB's order. First, OJD argues that ERB erred as a matter of law by certifying a "single-circuit-court" bargaining unit. OJD urges that any such bargaining unit is *per se* inappropriate given the overall structure and purpose of the unified state court system. Second, OJD argues that, even if a single-court unit is not *per se* inappropriate, ERB's order in this case is not supported by substantial evidence or substantial reason. More specifically, OJD contends that ERB could not find on this record that the Yamhill court employees' shared community of interest is stronger than the interests of other OJD employees and sufficiently distinct to warrant a separate bargaining unit. OJD further contends that ERB did not provide a rational explanation for that conclusion sufficient to withstand review. We consider each issue in turn.[25]

### A.  *Single-Court Bargaining Units in General*

In arguing that ERB erred as a matter of law in certifying a single-circuit-court bargaining unit, OJD acknowledges that our standard of review is deferential to ERB's adjudicative role in weighing and evaluating the evidence in unit determination cases. *See, e.g.*, *Deschutes County*, 40 Or App at 376 (articulating standard). But, OJD maintains, ERB must make the appropriate unit determination in a way that comports with the organic legal framework that governs the mission and structure of a given public employer. In this context, that framework includes, OJD urges, the unique structure of OJD and the deliberate legislative mandate for a unified court system that is "centrally administered at the state level." OJD emphasizes that, as part of that legislative mandate, the Chief Justice has the responsibility to set and apply to all OJD employees uniform policies on "[m]any mandatory subjects of bargaining—for example, wages, benefits, and grievance procedures." OJD thus asserts:

---

[25]  As we will explain, we agree with OJD's second argument (lack of substantial evidence and substantial reason) and we set aside ERB's order on that basis. We consider OJD's first argument even though it is not dispositive because, as we later explain, it informs the analysis of the second issue.

> "A single-circuit-court bargaining unit is inimical to the legislative policy behind the creation of OJD, which was to promote *greater* uniformity in employment policy among the circuit courts. If OJD must bargain separately with the employees of a single court, it necessarily must consider adopting employment policies otherwise set at the state level that apply only to the employees of that court. Yet adopting such policies will inevitably lead to greater administrative fragmentation of the workforce, not uniformity."

(Emphasis in original.) For ERB to certify a proposed bargaining unit along lines that fundamentally conflict with OJD's legal structure and essential mission is, OJD maintains, an error as a matter of law.

In response to OJD's argument, AFSCME relies on ERB's reasoning in its order. ERB agreed (as we earlier described) that a wall-to-wall bargaining unit would be "much more preferable." ERB did not agree, however, that "a single, wall-to-wall bargaining unit" is the only appropriate unit that may be certified consistently with the legislature's uniform state court design. ERB pointed to ORS 243.696(2), which provides, in part:

> "The Chief Justice of the Supreme Court shall represent the judicial department in collective bargaining negotiations with the certified or recognized exclusive representatives of all appropriate bargaining units of officers and employees of the courts of this state who are state officers or employees."

Emphasizing the statute's plural wording—"all appropriate bargaining units"—ERB concluded that the legislature contemplated "at least the possibility of multiple appropriate bargaining units" within OJD's workforce. ERB also pointed to the fact that the legislature expressly made OJD subject to collective bargaining under PECBA (ORS 8.270) without providing for any special OJD bargaining unit determination standards.

ERB also responded to OJD's concern that certifying the proposed single-court bargaining unit would force it to bargain separately over personnel policies for the Yamhill employees, which might lead to one set of policies for them

and different policies for the unrepresented employees in OJD. ERB considered that concern unfounded, suggesting that the proposed unit was unlikely to have a significant influence on OJD's personnel and workplace policies:

> "Although we are approving the proposed unit as appropriate for collective bargaining, we emphasize that nothing in this order or PECBA requires [OJD] to agree to any particular contract term; rather, PECBA requires only that [OJD], and the union, collectively bargain in good faith. *See* ORS 243.650(4) ('The obligation to meet and negotiate does not compel either party to agree to a proposal or require the making of a concession.'). Moreover, under PECBA, [OJD] is required to bargain over only mandatory subjects of bargaining—not statutorily permissive subjects or other 'subjects that the Employment Relations Board determines to have a greater impact on management's prerogative than on employee wages, hours, or other terms and conditions of employment.' ORS 243.650(7)(c). Additionally, PECBA does not exempt employees from performing their job duties or complying with work rules (whether the employees organize court-by-court or wall-to-wall). Thus, after considering [OJD's] concerns and the record in this case, we do not conclude that approving this unit would be inimical to the standardized and efficient adjudication of cases."

(Footnotes omitted.)

Finally, although ERB concluded that the legislature had contemplated at least the possibility of multiple appropriate OJD bargaining units, ERB did not believe that certifying bargaining units for many or all of the other circuit courts would be "the necessary result of finding the petitioned-for unit appropriate." ERB reasoned that "[n]othing in PECBA, or this Board's rules and case law, require this Board to continue approving district-based bargaining units just because this Board has approved this one." Moreover,

> "[a]t this point, granting this petition will result in only one bargaining unit. The record does not include evidence that AFSCME or any other labor organization is attempting to organize additional [judicial] District-based units or any other bargaining unit. It may well be that the petitioned-for unit is the only one that the [OJD] ever needs to collectively bargain with."

Even if other OJD employees desire representation in the future, ERB declared, "they have various options other than petitioning to form another [court]-based unit," such as petitioning to organize on a regional basis or seeking to accrete to (that is, join) the Yamhill County Circuit Court unit.[26] By way of a footnote, ERB commented that, "[e]ven if this Board permitted two different bargaining units to be created," the representatives of those units and OJD "potentially could address fragmentation concerns by agreeing to merge the units or engaging in coalition bargaining."

As a threshold matter, we agree with ERB that ORS 243.696(2) reflects the legislature's understanding that it would be at least *possible* that more than one bargaining unit would be appropriate for OJD's workforce. The pluralization of the word "units" in the statute suggests as much textually. Contextually, however, that conclusion is not free from doubt. The central purpose of that provision, as its plain terms reveal, was to add the Chief Justice to the statute as the designated bargaining representative for OJD. No such provision had been included in the original Court Reform Act.[27] The amendment came soon after the Court of Appeals had held that, notwithstanding the omission, OJD was still fully subject to collective bargaining under PECBA. *Lent v. ERB*, 63 Or App 400, 402, 664 P2d 1110, *rev den*, 295 Or 617 (1983).[28] The legislature's only objective may have been to

---

[26] The "accretion" of a group of unrepresented employees to an existing unit is not available to the unrepresented employees as a matter of right. It requires a showing of a requisite level of support among the members of both groups, in addition to other requirements. OAR 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(4) (requirements for clarification petitions that raise issue of adding unrepresented employees to an existing bargaining unit). ERB, in this case, did not explore the requirements for accretion. In past decisions, ERB has explained that accretion is available only for unrepresented employees who, as a group, "do not and cannot constitute an appropriate bargaining unit" of their own. *See Corrections Dept. and Exec. Dept. and AFSCME*, 12 PECBR at 888 (citing past ERB decisions).

[27] Context, for purposes of statutory interpretation, includes prior versions of the statute and existing case law, together with extant circumstances that give rise to the need for legislation. *State v. McNally*, 361 Or 314, 325, 392 P3d 721 (2017) (prior versions of same statute); *Northwest Natural Gas Co. v. City of Gresham*, 359 Or 309, 322-23, 323 n 7, 374 P3d 829 (2016) (presuming legislative awareness of relevant case law, prior statutes, and extant dispute between city and utility).

[28] Shortly after the Court Reform Act went into effect, then-Chief Justice Lent filed a declaratory judgment action disputing the extent to which the legislature intended OJD to have to mandatorily bargain under PECBA, as well as the constitutionality of any requirement that it must. *Id.* at 402. One argument

ensure the Chief Justice's obligation to engage in collective bargaining on behalf of OJD; pluralizing the word "units" would have been a natural word choice if the legislature did not consciously consider whether OJD should be organized on a wall-to-wall or some other basis.

There is another possibility, however. When ORS 243.696 was amended, multiple petitions were pending before ERB seeking to certify different configurations of bargaining units for OJD employees. *See generally OPEU-SEIU, AFSCME v. State Courts and Appellate Law Clerks*, 7 PECBR 6199 (1984). The first petition was filed by the Oregon Public Employees Unit (OPEU) before the Court Reform Act had even taken effect; that petition sought certification of a bargaining unit comprised only of the employees of the state appellate courts. *Id*. at 6200. After the Court Reform Act took effect, OPEU filed a second petition and AFSCME filed a first, each proposing to divide OJD's workforce between them based on the OJD employees' past representation when they were county employees.[29] While the

_____

that the Chief Justice made on legislative intent was that ORS 243.696 provided only for the state "Executive Department" to represent "state agencies" in collective bargaining; it did not include OJD or the Chief Justice. *Id*. at 404 n 3 (quoting then-current version of statute and discussing Chief Justice's argument). The court rejected that and other of the Chief Justice's arguments, and held that OJD was fully subject to PECBA. *Id*. at 407. Two months after the court issued its decision, the legislature added the second subsection to ORS 243.696 and included an emergency clause that made the amendment effective immediately on enactment. *See* Or Laws 1983, ch 763, § 64 (declaring emergency; effective August 4, 1983); *Lent*, 63 Or App 400 (decision dated June 8, 1983). A few weeks after the legislature amended the statute, the Supreme Court denied review in *Lent*. 295 Or 617, 670 P2d 1033 (order denying review dated August 31, 1983) (table).

[29] In its order, ERB explained that, before the Court Reform Act and while employed by the counties, some of the circuit court employees had been unrepresented, but many had been represented, usually by inclusion in county-wide bargaining units (that is, units that contained other county employees, not just court employees). *Id*. at 6202, 6204. OPEU had represented the court employees in Marion, Linn, Jackson, and Baker counties. AFSCME had represented the court employees in Benton, Columbia, Coos, Hood River, Lane, Polk, Union, Wasco, Clatsop, and Tillamook counties, and some but not all court employees in Multnomah County. The court employees in Klamath, Clackamas, and Yamhill counties were represented on a court-by-court basis by other labor organizations. *Id*. at 6202-03. AFSCME's petition sought designation of a unit consisting of all OJD employees except those that had been represented by OPEU and those employed by the appellate courts. OPEU's second petition sought designation of a unit consisting of all OJD employees whom it had represented when they were employed by the counties, all OJD employees who were unrepresented while employed by their county, and all employees of the appellate courts. *Id*. at 6200.

matter was pending, OPEU changed its position and agreed that the appellate court employees did not have "any different community of interest than the employees of the rest of the [newly unified] state court system." *Id*. at 6201. After ERB issued a proposed order on the consolidated petitions, the appellate court law clerks were allowed to intervene to argue that they should be excluded from the proposed bargaining units. *Id*. at 6200.

ERB resolved the competing positions of the parties by invoking its "long-standing policy against fragmentation" and its "general preference for wall-to-wall units wherever practicable." *Id*. at 6204. ERB ordered certification of a wall-to-wall unit, with one small group excluded: appellate law clerks. *Id*. at 6205. ERB found that those law clerks had distinct interests from the rest of OJD's workforce, in that they were limited duration employees whose "interests in retirement, transfer, job security, merit promotion, grievance procedures, vacation accumulation, and many other mandatory bargaining matters are so distinct" from those of the other OJD employees that it would be "inappropriate to include them" in the wall-to-wall unit that ERB was certifying. *Id*. ERB left it to the election process for the employees in the certified wall-to-wall unit to determine whether they would prefer to be represented by AFSCME or by OPEU, or not represented at all. *Id*. at 6206. As we know from the collective bargaining history recounted in the testimony in this case, the OJD employees elected to be unrepresented.

ERB's order resolving those petitions had not yet issued when the legislature amended ORS 243.696 to designate the Chief Justice as OJD's bargaining representative in negotiations with "all appropriate bargaining units."[30] But AFSCME's and OPEU's three petitions had been pending for some time, and both organizations had been parties to the litigation in *Lent*, 63 Or App 400. It is at least plausible

---

[30] ERB's order issued on January 11, 1984 (*id*. at 6206), approximately five months after the amendment to ORS 243.696 on August 4, 1983. Based on the case numbers assigned to each petition, OPEU's first petition was filed sometime in mid- to late-1982, and the other two petitions were filed relatively early in 1983.

(if not highly likely) that the legislature added subsection (2) to the statute aware that various efforts to organize OJD employees were in progress. The pluralization of the word "units" in the amendment therefore may have reflected the legislature's conscious choice not to put a "thumb on the scale" on a matter then-pending and under active consideration by ERB.

That context, coupled with the plural text of ORS 243.696(2), is enough for us to agree with ERB that the statutory scheme governing OJD should not be understood to dictate that only a wall-to-wall bargaining unit—and no other configuration—is appropriate for the OJD workforce.[31] But the question remains whether a *single-court unit*— for the Yamhill County Circuit Court or any other single Oregon court—is nevertheless inappropriate as a matter of law, as OJD argues.

If, in its order, ERB had embraced a "single-court" organizing principle for OJD's workforce generally, we would have no reservation agreeing with OJD and declaring that approach to be erroneous as a matter of law. We earlier recounted the history of Oregon's uniform court system and the extensive changes it brought about. We did that at length because it should not be glossed over. That history itself makes the compelling case for why collective bargaining for OJD employees cannot take place on a court-by-court basis throughout the state. To require the Chief Justice to negotiate and bargain on that basis would return Oregon's uniform state court system to the fractured system that the legislature abolished, with wages, benefits, and myriad personnel policies and practices set through court-by-court collective bargaining, rather than centrally and uniformly for all state court employees regardless of where they work throughout the state. In turn, the goal of "statewide allocation of resources" to establish "an accountable, equitably

---

[31] OJD, for its part, does not disagree. Before ERB, OJD appeared to have been more adamant that only a wall-to-wall bargaining unit could comport with the legal framework for OJD. In its briefing to this court, however, it has moderated its position. OJD now urges that, although ORS 243.696(2) "allows multiple bargaining units within OJD," the statute contemplates at most that "different types of OJD employees" (for example, the lawyers who work in various parts of OJD), might appropriately form a separate bargaining unit.

funded and uniformly administered system of justice" (ORS 1.001) would be fundamentally undermined.[32]

Rather than embrace that organizing principle, however, ERB explicitly rejected it. It did so by insisting, in essence, that this certification would be a one-time occurrence, with no implications for future OJD bargaining unit determinations that ERB might be called on to make. ERB's reasoning in that regard, however, is neither logically satisfying nor legally sound.

ERB began by declaring that nothing in PECBA or ERB's rules and case law require ERB to "continue" to approve other single-court-based bargaining units "just because [ERB] has approved this one"—a rationale that comes perilously close to suggesting that ERB permissibly may make unit determinations *ad hoc*, without adhering to guiding principles or uniform criteria from one unit determination to the next. To be sure, ERB cited as illustrative (but did not discuss) one of its past decisions, *Corrections Dept. and Exec. Dept. and AFSCME*, 12 PECBR 876. There, ERB declined to certify as an appropriate bargaining unit a new corrections facility, despite having certified separate units for certain other corrections facilities in the past. ERB explained in that case that circumstances had changed since its past certifications and that the new facility seeking certification would become part of an increasingly "integrated state penal operation":

> "The state is in the process of centralizing operations and exercising tighter control over management. Labor relations functions are becoming centralized with the ultimate authority for all major personnel decisions at the institutions being exercised by the department director, rather than by management at the institutions as in the past. The new hires will perform the same duties and have virtually the same working conditions as do the employees at the existing institutions. The community of interest among the current and new employees, in other words, is identical."

---

[32] The unification of Oregon's court system under the Court Reform Act set Oregon apart nationally. As then-Chief Justice Balmer explained in the ERB hearing, only one other state (New Jersey) has achieved the same level of unification and central administration for its court system that Oregon has achieved.

*Id*. at 889. In contrast to the public employer in that case, OJD achieved functional integration and highly centralized control and uniform personnel policies nearly 40 years ago, with ever-increasing integration, centralization, and uniformity since. The case that ERB cited refutes, rather than supports, ERB's reasoning here.

ERB's other explanations for how ERB could find the Yamhill court employees to be an appropriate unit, but not any other single-court proposed unit, are no more reassuring. They reduce to: (1) no other group has yet asked; (2) if one does, that group can propose something other than a court-based unit, such as one drawn on regional lines; and (3) the group can try to join the Yamhill unit. ERB all but announced that, for future petitions, it would change the ground rules and it would not consider certifying any future bargaining unit on the same terms that it had applied in this case. It is not too uncharitable, we believe, to describe ERB as having announced a "first come, only served" policy for the court employees of OJD.

ERB may not approach bargaining unit determinations that way, for the employees of OJD or those of any other public body. Although it may be correct that nothing in PECBA requires ERB to approve future petitions for single-court units "just because" it has approved this one, a central purpose of PECBA is to provide a "uniform basis" for recognizing the right of public employees to join organizations and be represented in their employment relations with their public employer. ORS 243.656(6). Consistently with PECBA itself, ERB may not act *ad hoc* and it may not disregard the cases that have come to ERB before or are reasonably likely to come to ERB in the future. The same is true under the Administrative Procedures Act. The point of reviewing administrative orders for substantial evidence, substantial reason, and compliance with controlling law is to ensure that administrative decisions are "rational, principled, and fair, rather than *ad hoc* and arbitrary." *Gordon v. Board of Parole*, 343 Or 618, 633, 175 P3d 461 (2007). And apart from those statutory sources requiring even-handed and principled decision-making, ERB has an obligation under Article I, section 20, of the Oregon Constitution "to

treat similarly situated people the same." *State v. Savastano*, 354 Or 64, 96, 309 P3d 1083 (2013). For ERB to certify this petition for a single-court bargaining unit of OJD employees, and no other, requires ERB to provide a rational explanation that is reasonably related to ERB's task in making unit determinations and to the petitioning-group before it. *Savastano*, 354 Or at 96. ERB's explanation for why it can certify this petition, and not like-kind future petitions, disregards those legal constraints on its decision-making role.[33]

The failure of ERB's explanation does not, however, lead us to hold that certification of a single-court or similar bargaining unit of OJD employees is *per se* unlawful. The issue is a close one. As we have concluded, the centralized structure of OJD and the legislative mandate for a uniform court system preclude, as a matter of law, organizing all or most of OJD's employees in a way that would require collective bargaining on essentially a court-by-court basis. But it is one thing to say that OJD's workforce generally may not be organized on that basis, and it is another to say that *no* group of employees working for any court anywhere in the state could constitute an appropriate bargaining unit, separate and apart from the bulk of OJD's workforce. We would need to be able to confidently declare the latter to agree with OJD.

---

[33] We recognize, as ERB often cautions, that unit determinations are "necessarily fact-driven," *Douglas County*, 26 PECBR at 388, and often require an "analysis tailored to the subject employees and the workplace at issue." *Assoc. of Oregon Corrections Employees v. Dept. of Corrections and AFSCME*, 18 PECBR 441, 446-47 (2000). Fact-matching often is of limited aid in unit determination cases, given the boundless variation in circumstances between different public employers (state agencies, counties, and cities), different workforces performing entirely different jobs (*e.g.*, law enforcement officers, road workers, corrections staff, maintenance workers, educators, engineers, medical professionals, clerical staff), in highly incomparable workplaces (prisons, medical facilities, schools, offices, outdoor environments). Thus, as a general proposition, it is "unlikely that a prior case involving a *different employer* will conclusively resolve a future case." *Douglas County*, 26 PECBR at 391 (emphasis added). Here, however, ERB's observations about future petitions pertain to the employees of one employer, OJD, who are all subject to the ultimate direction of a single administrative head—the Chief Justice—and who all work, as ERB expressly found, "in courthouses throughout the state[, all with] similar job duties, work hours, and workplaces." Factual comparison is not only possible in that context, it is necessary. ERB must be able to identify meaningful factual distinctions between one group of OJD's workforce and some other group of the same workforce to lawfully change the terms on which the two groups may exercise their right to collectively bargain.

But the record before us is inadequate in that regard. The record is extensively developed on the *uniform* aspects of the state court system, and thus on the interests that OJD employees throughout the state share under the centralized policies that the Chief Justice and State Court Administrator have put in place. We therefore know on this record what interests are common to the employees of all courts statewide. But in terms of what might be different and might distinguish any one court's employees from the rest of OJD's workforce, the evidence is limited to the Yamhill County Circuit Court. The record is all but silent on the other 26 judicial districts (with their 35 circuit courts), the appellate courts, and the Tax Court in terms of how working conditions or other collective-bargaining-related interests of their employees might be so unique or particular to those courts as to distinguish them from the rest of the state's unified court system. For that reason, we are unwilling in this case to go as far as OJD asks and declare that *any* single-court bargaining unit—whether for the Yamhill County Circuit Court or any other state court in Oregon—is inappropriate as a matter of law.

The issue that we *can* resolve on this record, however, is whether the factual evidence and ERB's reasoning are sufficient to support ERB's determination that the Yamhill County Circuit Court bargaining unit is an appropriate one. Our discussion above informs our analysis in that regard, as we will explain. We therefore turn to that issue.

B.   *The Proposed Yamhill County Circuit Court Bargaining Unit*

As we earlier described, when, as here, a proposed bargaining unit consists of a subset of a larger workforce, the appropriate unit determination requires a finding that the petitioning employees share a community of interest "sufficiently distinct" from the interests of the excluded employees to warrant the proposed separate bargaining unit. *Washington County*, 20 PECBR at 756. In its order, ERB found that the Yamhill employees' community of interest is significantly "stronger than, and distinct from, their community of interest with other [OJD] employees" based

principally on the fact that they have "day-to-day working conditions" that the presiding judge and TCA have discretion to set. Those interests are, ERB concluded, "distinct enough" from those of other OJD employees to "support creation of a separate unit" to represent the Yamhill court employees and no others.

OJD challenges ERB's community of interest conclusion, arguing that it is not supported by substantial evidence and substantial reasoning. Specifically, OJD asserts:

> "At its core, [ERB's] decision was grounded on a conclusion that the Yamhill County Circuit Court employees have different enough working conditions from all other OJD employees that they form a clearly distinct community of interest. To make a comparison between two things, however, there must be evidence concerning the nature of both. But here, there is, at most, evidence in the record concerning a handful of the policies and practices at the Yamhill County Circuit Court, and no evidence concerning the policies and practices at other courts[.]"[34]

OJD further argues that ERB did not adequately explain how it evaluated the shared and distinct interests of employees in the proposed unit and explain its conclusion that those interests were stronger than the interests they have in common with all other OJD employees:

> "For example, the order does not explain why some factual findings, which potentially indicate a distinct community of interest—*e.g.*, physically separate locations or separate immediate supervisors—should have outweighed other findings of similarities—*e.g.*, identical wages and benefits; identical statewide policies and procedures; 'similar job duties, work hours, and workplaces'; similar job functions; identical skills and training requirements; a single grievance procedure that applies to all employees; and the ability of circuit court employees to seamlessly cover the positions of employees at other circuit courts."

---

[34] The dissenting member of ERB made the same basic point. Without evidence of the policies of other courts, such as those for adjusted work hours, flex and part-time schedules, and use of accrued leave, she could not agree that the policies in place for the Yamhill employees could be considered different and distinct from those of other courts. The majority offered no response to that point.

We agree that ERB's "distinct" community of interest finding lacks the factual support that it requires. Assessing whether a proposed unit of employees shares a community of interest that is "distinct" from the employees excluded from the unit is an inherently comparative exercise. *See Washington County*, 20 PECBR at 752 n 4 ("The important factor is not the label of the group, but rather the community of interest they share when *compared* to the interests of other employees." (Emphasis added.)). To undertake that analysis, ERB must first examine the shared collective bargaining interests of the employees in the proposed unit; ERB must then compare those shared interests to the collective bargaining interests of employees who will be excluded. *See id.* at 756-57 (engaging in comparative analysis).[35] For the comparison to be meaningful, it is not enough to examine only the interests that the two groups have in common—*e.g.*, wages, benefits, and personnel rules—and contrast them with the internally shared interests of the petitioning employees—*e.g.*, locally-set policies on part-time schedules, adjusted daily work hours, and performance review requirements. The analysis also requires examining the different and potentially divergent interests of the excluded employees. In this context, that means examining the policies in place for other OJD employees in terms of part-time schedules, adjusted daily work hours, and similar policies that are set by local court administrators. Without that comparison, it is not possible to determine the extent to which the interests of the two groups actually diverge, and thus are distinct. Neither is it possible to assess whether any divergence in interests is sufficient to warrant a separate bargaining unit for the petitioning employees.[36]

---

[35] ERB does not always describe the analysis in terms of the "collective bargaining interests" of the employees, no doubt because that is a given. But ERB has emphasized in some cases that the focus of the community of interest factor is on the employees' collective bargaining interests, not interests of a more general nature. *See, e.g.*, *Fairview Training Center v. AFSCME*, 8 PECBR 6666, 6688 (1984) (emphasizing that the analysis requires assessing the "labor relations" community of interest of employees included and excluded from proposed unit); *Revenue Hearing Officers Assn. v. Dept. of Revenue and OPEU*, 7 PECBR 6068, 6091 (1983) (similarly emphasizing that analysis of community of interest factor evaluates "collective bargaining interests" of employees).

[36] The traditional test under federal labor law, from which PECBA's "community of interest" factor was borrowed, emphasizes that aspect of the analysis. Under that traditional test, "the analysis logically begins by considering whether

ERB did not make the needed comparison in this case. ERB considered the shared collective bargaining interests of all OJD employees in wages, benefits, personnel policies, and similar uniform OJD workforce policies. ERB also examined the interests that the Yamhill employees share among themselves in terms of the administrative policies that their presiding judges and TCA have some latitude to set (*e.g.*, part-time schedules, adjustable work hours, performance evaluations). But ERB did not examine any locally-set administrative policies in place for any other of the state's 26 judicial districts and 35 circuit courts (or the appellate or tax courts). Nor could it. The record is all but silent on that score.[37] ERB therefore could not compare and contrast the workplace conditions of

---

the petitioned-for unit has an internal community of interest using the traditional criteria[.]" *The Boeing Co.*, 368 NLRB No 67, slip op at 3 (Sept 9, 2019). Then, "a comparative analysis of excluded and included employees" is required. *Id*. That means more than just assessing the internal shared interests of the employees in the proposed unit and their shared interests with the excluded employees. The analysis also requires considering the distinct interests of the excluded employees so that the shared *and distinct* collective bargaining interests of both groups—*i.e.*, the included and excluded employees—can be comparatively analyzed and weighed. *Id*. at 4; *see also PCC Structurals, Inc.*, 365 NLRB No. 160, slip op at 5-7, 10 (Dec 15, 2017) (extensive discussion of traditional test).

[37]  What little evidence exists in the record suggests the likelihood of similar and often common local court workplace policies, not significantly dissimilar or *sui generis* ones. At least twice annually, presiding judges and the Chief Justice meet as a group to discuss "best practices" at the circuit court level and be "on the same page" as much as possible. TCAs do the same. With the passage of time since the initial unification of the state courts, TCAs as a group have seen the value of uniformity and have made the conscious decision to influence their respective courts to become increasingly uniform with the others. The record reveals other ways that individual courts work together to share policies and practices as well. For example, the TCA for the Yamhill County Circuit Court, before becoming the TCA there, worked in the circuit courts in Marion and Multnomah counties, as well as in the State Court Administrator's Office. Some of the discretionary policies and practices that she has implemented—such as annual performance evaluations for all staff—were in place in her other work environments. In setting work performance expectations as part of the performance evaluation process, she drew from those in place in Marion County when she worked there, and she also researched the work performance expectations used in several other courts. As another example, the presiding judges and TCAs for several of the courts in the Willamette Valley (*i.e.*, those in Yamhill, Linn, Benton, and Polk counties) expect to work together on the statutorily mandated "business continuity plans" for each of their courts, with the goal of being able to assist each other if one court were damaged by a fire, a flood, or other disaster and needed to relocate staff to work at another courthouse. Cross-court efforts of that kind are likely to encourage individual courts to coordinate their locally set workplace policies. In short, what evidence there is in the record about the personnel policies and practices of individual courts throughout the state provides a basis to infer that those policies and practices are significantly similar and often the same, not the opposite.

the Yamhill employees with those of the employees in the rest of OJD. Without that comparison and possible contrast, it is not possible to know whether and how much those workplace policies actually differ court-to-court. And without knowing that, it is not possible to assess if the Yamhill employees' collective bargaining interests are "distinct" from those of the rest of the OJD workforce to any significant degree.

ERB did not explain how it could make its "distinct" community of interest finding without the comparison that is inherent in that statutorily mandated factor. ERB's order suggests a possible rationale, however. ERB described the Yamhill County Circuit Court presiding judge and TCA as having exercised their administrative discretion to adopt a number of personnel policies and practices "that acutely affect the petitioned-for employees, and only those employees." ERB also described the presiding judges and TCAs of each of the circuit courts as having "significant authority and discretion over a variety of personnel matters *** that acutely affect their court's employees (and only those employees)." Those observations suggest that ERB may have reasoned that the mere existence of some administrative policy discretion at the local court level, regardless of how that discretion is exercised, gives the employees of each court a "distinct" community of interest, because each court's employees, and only those employees, have a collective bargaining interest in how that discretion is exercised in their court; no comparison of policies from one court to the next was therefore required.

That rationale—if it was ERB's rationale—would be a blueprint for court-by-court bargaining units. If the Yamhill employees have a "distinct" community of interest because they, and only they, are subject to the discretionary policy choices of their presiding judge and TCA, then the employees of each circuit court (and of the appellate and tax courts) also have a "distinct" community of interest of their own. Likewise, if the Yamhill employees' community of interest is "sufficiently distinct" to warrant a separate bargaining unit for the same reason, and requires no comparison to the policies implemented in other courts to see whether or how they differ, then the employees of the other courts can make the same case for bargaining units of their

own. As we have concluded, however, an organizing princi-
ple for OJD's workforce that would require OJD to negotiate
and bargain on a court-by-court basis is fundamentally at
odds with the legislature's uniform court system structure.
For ERB to certify the proposed unit on that rationale would
be an error as a matter of law.

We therefore agree with OJD that, on this record,
ERB could not reasonably conclude that the proposed unit of
Yamhill County employees share a "distinct" community of
interest. ERB did not and factually could not make the nec-
essary comparison between the employees in the proposed
unit and the rest of the OJD workforce that its "distinct"
community of interest conclusion requires. Without that fac-
tual comparison, ERB's order is not supported by substan-
tial evidence.

For related reasons, we also agree that ERB's order
is not supported by substantial reason. ERB concluded that
the Yamhill employees share a community of interest that
is "significantly stronger than" the interests they share with
other OJD court employees. ERB likewise concluded that
the Yamhill employees' shared interests were "sufficiently"
distinct for a bargaining unit consisting only of the Yamhill
employees. ERB did little to explain those qualitative assess-
ments. ERB merely listed, in a highly generalized way, the
interests that Yamhill employees share with the rest of the
employees in OJD, and identified a few policies set at the
local level that affect the Yamhill employees "and only those
employees."

On other facts, ERB's conclusion might require little
explanation of how the facts that ERB found support the con-
clusion that ERB reached. If the interests of a petitioned-for-
unit of employees differ from those of the excluded employees
in terms of the most basic subjects of collective bargaining—
wages, hours, the jobs they perform, and the physical envi-
ronment in which they perform them, for example—listing
those differences may be explanation enough for a conclusion
that those employees have a sufficiently distinct community
of interest to warrant a separate bargaining unit. *See, e.g.,*
*Fairview Training Center*, 8 PECBR at 6687-88 (identifying
those differences in comparison of guards and nonguards at

secure state mental health institution; summarily concluding two groups have distinct community of interests warranting two bargaining units). The need for explanation is greater, however, when the differences between two groups relate to workplace differences that are not as central to collective bargaining and are not the kind of interests that typically create significant conflicts among employees. *See Continental Web Press, Inc. v. NLRB*, 742 F2d 1087, 1091 (7th Cir 1984) ("The greatest conflicts of interest among workers are over wages, fringe benefits, and working conditions."). As federal courts have observed in their review of NLRB decisions for substantial reason:

> "Merely recording similarities or differences between employees does not substitute for an explanation of how and why these collective-bargaining interests are relevant and support the conclusion. Explaining why the excluded employees have distinct interests in the context of collective bargaining is necessary to avoid arbitrary lines of demarcation."

*Constellation Brands, U.S. Operations, Inc. v. NLRB*, 842 F3d 784, 794-95 (2nd Cir 2016).

What thought process led ERB to its conclusion in this case? More specifically, why did ERB conclude that the Yamhill employees' interests in certain locally-set policies (*e.g.*, part-time schedules, adjustable daily work hours, and performance evaluation requirements) were so significant as to outweigh and eclipse the uniform policies for all OJD employees governing their wages, job security (grievance procedures, layoffs, etc.), medical and dental benefits, retirement programs, leave accrual types and rates, and courthouse security, among the many other uniform OJD working conditions that are relevant to collective bargaining? ERB did not explain.[38] But it needed to. ERB generally discounts

---

[38] ERB likewise did not explain how its finding that Yamhill employees are relatively isolated physically and socially from other OJD employees supports its "distinct community of interest" conclusion. In federal labor cases, interaction and exchange among employees can have relevance in assessing an "intersection of interests" among employees whose wages, benefits, hours, and physical environments differ and who otherwise do not have common enough interests to be in the same bargaining unit. *See, e.g.*, *Pac SW Airlines v. NLRB*, 587 F2d 1032, 1042-43 (9th Cir 1978) (illustrative facts and analysis). The relevance of limited contact and interchange between OJD employees in the context of OJD's functional integration and uniform wages, benefits, and personnel policies is not obvious.

the kind of workplace variations that it relied on here, finding instead that they do not create a distinct community of interest when all employees in a workforce share the "basic terms and conditions of employment," such as "*similar* pay, work hours, overtime, seniority, lay-off, holidays, vacations and sick leave benefits, health benefits, retirement benefits, [and] grievance procedures." *Assoc. of Public Employees*, 10 PECBR at 891 (emphasis added). We have identified no ERB decision, and ERB cites none, where a public employer has had the functional integration, central administration, and uniformity in its policies that OJD has, yet ERB has found a "distinct" community of interest for such a small group of employees (27 of 1,200) based on the kind of workplace variations that the Chief Justice permits (but has ultimate authority to control). Without an explanation of how ERB reasoned from the facts to its conclusion, ERB's order lacks substantial reason.

AFSCME does not directly respond to OJD's substantial evidence and substantial reason arguments. For the most part, AFSCME characterizes OJD's arguments as amounting to a disagreement with how ERB weighed the relevant statutory and administrative factors, particularly its administrative preference for larger units. AFSCME then relies on our deferential standard of review. *See, e.g.*, *Deschutes County*, 40 Or App at 376 (court defers to ERB on weight to be given various criteria in unit determinations). Indeed, AFSCME goes so far as to urge that, even if we find "some fault" with ERB's evaluation of the relevant criteria, we must still affirm ERB's order because of the "broad scope of authority delegated to ERB by the legislature" to make appropriate bargaining unit determinations.

In that regard, AFSCME characterizes "appropriate bargaining unit" as a delegative term within the meaning of *Springfield Education Assn.*, 290 Or 217, and argues at some length that ERB has particular license in making unit determinations without judicial interference. "Appropriate bargaining unit," however, is statutorily defined in terms of the two procedural routes that can result in such a unit: ERB certification *or* the employer's voluntary recognition. ORS 243.650(1). ERB does not have exclusive province over unit determinations. What the legislature has delegated to

ERB is the authority, when it makes appropriate unit determinations, to supplement the statutorily mandated criteria by considering other like factors. *See* ORS 243.682(1)(a) (ERB "shall consider such factors as community of interest"). We do not discount the importance of ERB's interpretative role in advancing that generally expressed legislative policy, both through rulemaking and adjudicating contested petitions for unit certification. But, in that regard, ERB performs the same significant function—not one somehow broader in scope or administrative license—as other administrative bodies whose decisions affect important public and private interests.

Neither ERB's role in adjudicating contested petitions for unit certification nor our appropriately deferential standard of review insulates ERB's decision from judicial review for substantial evidence and substantial reason. As this court has explained, the fact that an administrative body may use its experience to evaluate and understand evidence is not "a substitute for evidence presented at a hearing." *Rolfe*, 53 Or App at 951. And the Supreme Court, after quoting *Rolfe* with approval, has emphasized the importance of substantial evidence review, even for bodies that, like ERB, have particularly specialized expertise:

> "The substantial evidence rule is a safeguard for anyone faced with the possibility of adverse consequences from a decision of an administrative agency. The rule loses its meaning if it is interpreted as leaving to the internal 'expertise' of agency personnel, rather than to the external scrutiny of appellate courts, the critical question whether the facts of the case permit the administrative choice involved."

*Drew*, 322 Or at 499. The same is true of review for substantial reason, which requires administrative agencies "to demonstrate in their opinions the *reasoning* that leads the agency from the *facts* that it has found to the *conclusions* that it draws from those facts." *Id*. at 500 (emphasis in original). That requirement, among other virtues, facilitates judicial review, assures proper application of legal principles, guards against arbitrary outcomes, and fosters consistency in administrative decision-making. *Id*. (citing cases and authorities). For that reason, an agency's "failure

to connect permissibly its facts and its holding is fatal to the agency's order." *Id*. at 500-01.

The remaining question is the appropriate disposition in this case. Under ORS 183.482(7)(c), we have discretion to either set aside or remand ERB's order if it is not supported by substantial evidence and, by extension, substantial reason. Here, ERB's distinct community of interest conclusion was central to its appropriate unit determination. The other factors that went into ERB's decision (employee desires and the failure of past wall-to-wall organizing efforts) are not enough to support certification without satisfying the distinct community of interest criterion, as ERB has repeatedly observed. *See, e.g.*, *AFSCME v. City of Ontario*, 22 PECBR 260, 275 (2008) (employee desires and lack of prior representation not a basis for certification in absence of distinct community of interest (citing cases)); *Welches Education Assn.*, 12 PECBR at 317 (employee desires are not controlling in unit determination decisions). Where, as here, the record lacks the evidence necessary for the comparative analysis that the community of interest factor requires, we conclude that the appropriate remedy is to set aside ERB's order. *Cf. City of Ontario*, 22 PECBR at 277-78 (dismissing clarification petition where record developed at hearing did not permit needed assessment of interests of employees excluded from petition).[39]

Order set aside.

---

[39] OJD requests that we set aside ERB's order. AFSCME does not take issue with that requested disposition; AFSCME disputes only whether OJD's challenges have merit and asks that we affirm ERB's decision.